KATHERINE B. FANNON v. FEDERAL CARTRIDGE CORPORATION.
VICTOR CHRISTGAU, DIRECTOR OF DIVISION OF EMPLOYMENT AND SECURITY; RESPONDENT.[1]

February 9, 1945.

No. 33,939.

[1]Reported in 18 N. W. (2d) 249.

*Henry F. Simons, Faegre & Benson,* and *Raymond Scallen,* for relator.

*William D. Gunn,* for claimant-respondent.

*J. A. A. Burnquist,* Attorney General, and *Knute D. Stalland,* Assistant Attorney General, for respondent Victor Christgau.

THOMAS GALLAGHER, JUSTICE.

*Certiorari* upon the relation of Federal Cartridge Corporation, employer, to review the decision of the director of the state division of employment and security holding that the separation from her employment of Katherine B. Fannon, hereinafter referred to as claimant, was involuntary and for good cause attributable to the employer; that all wage credits earned by claimant in such employment be allowed; and that she be qualified for benefits under Minn. St. 1941, § 268.09, as amended by L. 1943, c. 650, § 5 (Mason St. 1944 Supp. § 4337-27[A]).

On March 16, 1944, claimant was first disqualified by a claims deputy of the division, on the ground that she "voluntarily and without good cause attributable to the employer" discontinued her employment with the employer, and on the further ground that she

had failed to establish that her return to employment would have imperiled her health.

On April 15, 1944, an appeal tribunal of the division, after hearing the evidence, vacated the order of the claims deputy and determined that claimant was not disqualified for benefits, holding that her separation from employment was because of illness due thereto, and hence involuntary and for cause attributable to the employer.

On July 28, 1944, on appeal, the director determined that "the findings of fact and decision appealed from are in accordance with the evidence and the law * * * and the same hereby are affirmed." The appeal here is taken pursuant to Minn. St. 1941, § 268.10, as amended by L. 1943, c. 650, §.6 (Mason St. 1944 Supp. § 4337-28).

On March 7, 1942, claimant commenced working at the Twin Cities Ordnance Plant at New Brighton, operated by the Federal Cartridge Corporation. It is not disputed that prior thereto she was in perfect health. Her employment there continued until June 22, 1943. In connection therewith, she worked first as a visual inspector for eight months and thereafter in the incendiary bullet department for three months. In the latter employment she was required to work with gunpowder, which seriously affected her physical condition. Her face, hands, and feet began to swell and her skin turned a greenish shade. She testified: "I couldn't pick them [her feet] up and at night my feet would go that way. Finally they swelled up so big and I was so nervous I couldn't stand it. I went up to the doctor then." The foreman thereupon caused her to be transferred to a position as a "move woman," in which she continued until May 1943. In this work she was required to move heavy iron trucks loaded with shells. It was "a regular man's job." She worked in a temperature of 132 degrees.

Her condition did not improve, and about the first of May 1943 she collapsed. She requested and was granted a 14-day regular sick leave. She went to a hospital under the care of Dr. John Alden, who advised her not to return to work at New Brighton, as she was allergic to the gunpowder at the ordnance plant and would not recover as long as she continued there. At the expira-

tion of her 14-day leave, she advised her employer that she was still ill, and she was granted an extension of leave from June 1 to June 22, 1943.

Just prior to the expiration of her extended leave of absence, she returned to the plant and told her foreman that upon her doctor's orders she could not work there again. After some discussion she was granted a release.

As a result of the illness contracted at the ordnance plant, claimant was in bed until September 1943. She was almost blind during this period. In September 1943, she recovered sufficiently to resume employment. It is undisputed that she would have been physically unable to resume work as a "move woman" then or at any time thereafter.

In September 1943, she commenced working for the Mollan Home Permanent Wave Company and continued there until November 1943. At that time she started working for the Northwestern Aeronautical Corporation and remained there until January 13, 1944, when she was "laid off" because of material shortage. On February 25, 1944, she registered and filed the claim for benefits here involved. At that time she had been advised by the employer here that no employment was available for her at the Twin Cities Ordnance Plant—that they "were not hiring." Counsel for the employer concedes that if claimant had been physically able then to return to the plant the employer would have been unable to rehire her because of seniority rules.

Claimant filed her claim on February 25, 1944, nearly ten months after her separation from employment with the Twin Cities Ordnance Plant. At that time she was available for employment and unemployed through no fault of her own. If her wage credits with the Twin Cities Ordnance Plant in the sum of $1,312 were cancelled in accordance with the contention of the employer here, claimant would not be entitled to any benefits under the act, because her subsequent employment was so limited that the wage credits therefrom were insufficient to entitle her to such benefits.

On appeal, the employer contends that (1) because claimant voluntarily resigned her employment; (2) because her illness was not due to good cause attributable to her employer; and (3) because she did not attempt to resume her former employment upon her recovery in September 1943, she must lose her wage credits with the Twin Cities Ordnance Plant and hence be disqualified for benefits under the act.

■ The statute here involved, L. 1943, c. 650, § 5 (Mason St. 1944 Supp. § 4337-27[A]), provides:

"An individual shall be disqualified for benefits: A. If such individual voluntarily and without good cause *attributable to the employer* discontinued his employment by such employer and all wage credit earned in such employment shall be cancelled." (Italics supplied.)

Prior to July 1, 1943, § 4337-27(A)[2] provided:

"* * * if it is found by the director that such individual voluntarily and without good cause discontinued insured work from any base period employer. Available benefits shall be reduced as if the full weekly benefit amount had been paid for each such week."

It is to be noted that the clause "attributable to the employer" was added by the 1943 amendment.

The unemployment compensation law seeks to provide for payment of benefits to those who are unemployed through no fault of their own. It provides for the charging of a portion of such benefits to the employer's account, with the result that such charges are reflected in and increase the employer's rate of contribution to the state fund. It is therefore to the interests of the employer to maintain stable employment whenever possible. See, Minn. St. 1941, § 268.06, as amended by L. 1943, c. 650, § 2 (Mason St. 1944 Supp. § 4337-24). The public policy declared in the act itself provides (§ 268.03 [Mason St. 1940 Supp. § 4337-21]):

"As a guide to the interpretation and application of this act, the

---

[2]L. 1941, c. 554, § 6, Mason St. 1941 Supp. § 4337-27(A)(1).

public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

There is nothing in this language to justify the conclusion that benefits under the act accrue only when unemployment is the result of some *wrongful* act or *fault* of an employer. In the instant case, it is undisputed that claimant was justified in leaving her employment because of her health and that such illness and disability were directly connected with her employment. While she intended to terminate her employment, and to this extent it may be argued that such termination was voluntary, on the other hand, it is clear that her health and personal welfare made it imperative for her to stop without further delay; in fact the evidence indicates that had she not left her work after her collapse in May 1943 she would in all probability have been carried out of the plant on a stretcher. An act of necessity may not be a voluntary act. See, Duncan v. Preferred Mut. Acc. Assn. 36 N. Y. St. 928, 13 N. Y. S. 620; Town of Cleveland v. Industrial Comm. 232 Wis. 147, 286 N. W. 558. We cannot escape the conclusion that where, as here, an employe is impelled because of sickness and disease to terminate employment because continuance thereof would endanger his health and personal welfare, such termination is an involuntary rather than a

voluntary act on the part of the employe within the meaning of § 4337-27(A).

■ Likewise, it seems that under a reasonable construction of the legislation involved, the separation of employment here was for "good cause attributable to the employer." By this we do not imply any wrongful act, negligence, or failure on the part of the employer here in supplying reasonable and safe working conditions. As we construe the law, the legislature did not intend that some wrongful act or negligence be first established by a claimant before termination of his employment on account of sickness or disease directly connected therewith could be said to be for "good cause attributable to the employer." Rather, we feel the legislature intended that, where factors or circumstances directly connected with employment result in illness or disease to an employe and make it impossible for him to continue therein because of serious danger to his health, termination of employment for this reason may correctly be said to be involuntary and for "good cause attributable to the employer," even though the employer be free from all negligence or wrongdoing in connection therewith.

It is interesting to note that Mason St. 1944 Supp. § 4337-27(E)(1), in prescribing rules for determining whether work is suitable for an unemployed individual, provides that "the director shall consider the degree of risk involved to his health, safety, and morals, his physical fitness * * *." Under this section, a claimant cannot be disqualified for refusing to *accept* employment which may be a risk to or endanger his health. If this be true, then certainly it is unreasonable to hold that a claimant must lose credits or be denied benefits where he has been compelled to *terminate* employment because such employment has resulted in a physical condition or disease likewise dangerous to health and personal safety. In this connection, of course, the claimant has the burden of establishing that the disease or illness complained of necessitated termination of his employment; that such disease or illness was due to such employment; and that no change or remedy other than final termination was available to restore him to good health.

It is noteworthy that prior to the commencement of these proceedings, the attorney general of Minnesota in an able opinion given on October 12, 1943, arrived at a viewpoint similar to that now adopted by this court. See, Attorney General's Report, 1943-1944, Opinion No. 151. We recognize the fact that in a few states where this question has been submitted for decision under somewhat similar statutes, decisions somewhat contrary have sometimes been expressed, but regardless thereof we are of the opinion that the language of the statute here and the obvious intent of the legislature compels the foregoing construction in administering the Minnesota act.

■ Relator contends that under Mason St. 1944 Supp. § 4337-27(7)[G], claimant is disqualified, regardless of the construction placed on the previous sections of the act. It provides:

"An individual shall be disqualified for benefits:

\* \* \* \* \*

"(7)[G] If such individual cannot accept his former employment when offered by such employer for reasons not attributable to such employer or if he is unable to perform such work or is no longer eligible or available for such employment and all wage credits earned in such employment shall be cancelled."

Section 4337-27(E) provides in part as follows:

"An individual shall be disqualified for benefits:

\* \* \* \* \*

"E. If the director finds that he has failed, without good cause, either to apply for available, suitable work when so directed by the employment office or the director or to accept suitable work when offered him, \* \* \*. Suitable work shall be his former employment or any work for which such individual is reasonably fitted \* \* \*."

It is obvious that these two sections must be construed together and that if § 4337-27(7)[G] were to be given a literal interpretation it would nullify the suitable work provision of § 4337-27(E) enacted by the same legislature. We do not believe the legislature intended

that an employe should be disqualified for benefits or lose wage credits accumulated, regardless of the language of § 4337-27 (7) [G], where he is *unable* to perform his former employment. Section 4337-27(E) clearly indicates that the legislature did not intend to subject an individual to physical risk or disease in connection with his employment in order to remain qualified for benefits under the act. Thus, claimant's failure here to seek reëmployment in her former position when the undisputed evidence disclosed that it would have subjected her to the same risks previously resulting in her disease and disability, and when such employment would have been in direct violation of the instructions of her physician, did not result in a loss of her wage credits under the act or in her disqualification for benefits either under § 4337-27(E) or § 4337-27(7)[G].

In this connection, the language used in the Attorney General's Report, 1943-1944, Opinion No. 148 (September 17, 1943), prior to these proceedings, seems appropriate here:

"* * * We must read subsection 7[G] together with subsection E in an attempt to give a reasonable construction to the entire section and effectuate the purpose of the Legislature if possible. It could hardly be said that the first suitable work definition above quoted and the second definition, which was already a part of the law before the 1943 Session and which was re-enacted by the 1943 Legislature at the same time that it adopted the amendment known as 7[G] were to be nullified by said 7[G]. One can only reconcile subsection 7[G] with subsection E(1) by holding that 'former employment' in the former must be found by the director to be suitable in accordance with the definition of suitable work in said subsection E(1) before an employee's wage credits can be cancelled.

\* \* \* \* \*

"* * * if * * * an individual's former employment is such that his health will be seriously impaired if he accepts it, or * * * the employee's physical condition has so changed as to render him unable to perform his former employment * * * and * * * [he]

thereafter files a claim for benefits and is available, by reason of experience, for other work and is thereupon offered his former employment which he cannot accept because he is unable to perform the same, his wage credits should not be cancelled because such former employment is not suitable, having due regard to his physical fitness."

For the reasons stated, the determination of the director must be affirmed.

Affirmed.

