LYONS *v.* EMPLOYMENT SECURITY COMMISSION.

1. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —VOLUNTARY QUIT.

The statutory provision disqualifying an individual for unemployment compensation benefits if he leaves his work voluntarily without good cause attributable to his employer applies to separations from work performed outside this State (CLS 1956, § 421.29).

Per DETHMERS, C. J., and CARR, KELLY, SMITH, EDWARDS, and SOURIS, JJ.

2. SAME—DISQUALIFICATION FOR BENEFITS—VOLUNTARY QUIT—FINDING OF FACT—EVIDENCE.

Finding of fact by referee and appeal board of the employment security commission that plaintiff, a cutter grinder, had left his employment voluntarily without good cause attributable to his employer, whose plant was 273 miles distant in Indiana, *held*, supported by evidence adduced and not subject to reversal on review by circuit court on certiorari, hence, plaintiff was disqualified from receiving unemployment compensation benefits (CLS 1956, § 421.29).

3. COSTS—PUBLIC QUESTION—CONSTRUCTION OF STATUTE.

No costs are allowed on appeal in proceeding to recover unemployment compensation benefits because public questions were involved, per SMITH, EDWARDS, and SOURIS, JJ., and because a question of statutory interpretation was involved, per DETHMERS, C. J., and CARR and KELLY, JJ.

SMITH, EDWARDS, and SOURIS, JJ., dissenting.

Appeal from Wayne; Streeter (Halford I.), J., presiding. Submitted April 8, 1960. (Docket No. 36, Calendar No. 48,190.) Decided April 26, 1961. Rehearing denied June 28, 1961.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 35.

Circumstances of leaving employment, availability for work, or nature of excuse for refusing re-employment as affecting right to social security or unemployment compensation. 158 ALR 396, 165 ALR 1382.

[3] 14 Am Jur, Costs § 37.

Certiorari by Charles Lyons against the Michigan Employment Security Commission, its Appeal Board, and Chrysler Corporation to secure unemployment compensation benefits which had been denied him by commission on ground he had voluntarily left work. Judgment for plaintiff granting compensation. Defendant Employment Security Commission appeals. Reversed.

*Zwerdling & Zwerdling* (*Morris Zwerdling,* of counsel), for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *E. J. Setlock,* Assistant Attorney General, for defendant Michigan Employment Security Commission.

*G. Lee Philp,* for defendant Chrysler Corporation.

EDWARDS, J. (*dissenting*). This is a saga of modern American initiative—as to which we are asked to indorse a bitter penalty.

An auto-worker named Lyons had a wife, 7 children, a house, and a job all located in a Detroit-area community. He was laid off from the job—but not from the other responsibilities.

While he was laid off and drawing unemployment compensation, Lyons heard about a chance for work at the Chrysler plant at Indianapolis—273 miles from his home in Trenton. Promptly he drove to Indianapolis, was offered a job, and took it.

What this record shows beyond all dispute is that Lyons was an optimist. Whatever his hopes may have been, 2-1/2 weeks later, the car he had depended on for transportation had broken down; the friend with whom he had planned to commute to Indian-

apolis had gotten sick and quit; Lyons had received no overtime work or pay; and his 15-year-old son had left home. At this point, Lyons took stock and decided, in his own words, "I just couldn't make it, that's all."

It is suggested to us that this represents the sort of voluntary desertion of employment which the employment security act forbids, and that Lyons, his wife and his 7 children must lose the benefit of all of the unemployment compensation as to which he had built up credits in his former job in Trenton.

No one argues that Lyons had any duty to take the Indianapolis job in the first place. Indeed, the inference is that he was stupid to do so. If he had spent most of his days in a rocking chair and never left the Detroit area to look for work, his unemployment compensation checks would have been safe enough.

Because our hardy optimist took a chance (along with a job) and soon found he "couldn't make it," he would be held to be a quitter of the "voluntary" variety. As to him (and his wife and children), his decision in the Indianapolis employment office is to be made one of the sudden death variety.

We hold that this result is not in accord with the facts; is not in accord with the express language of the employment security act; is not in accord with the basic purpose and spirit of the act. Further—although hardly controlling of decision—such a result would make a mockery of our claim that we prize the individual spirit of initiative.

This appeal requires interpretation of one of the disqualification provisions of the employment security act.[1] Ultimately, it turns upon a single word. Yet that word expresses a concept which through the

---

[1] PA 1936 (Ex Sess), No 1, as amended (CL 1948 and CLS 1956, § 421.1 *et seq.* [Stat Ann and Stat Ann 1957 Cum Supp § 17.501 *et seq.*]).

ages has provoked vast dispute amongst the world's greatest philosophers. It is the word "voluntary."

Except in 1 particular, the facts are not at issue.

The claimant, Charles Lyons, worked for Chrysler Corporation at its Trenton, Michigan, engine division plant. He lived with his wife and 7 children at Trenton, where he was buying his home. He was laid off July 15, 1957, because of lack of work. He applied for and began to receive unemployment compensation.

A month later, having heard of job possibilities there, claimant drove 273 miles to Indianapolis, Indiana, where on August 19th he hired in as a cutter grinder at the Chrysler Indianapolis plant. He claims that on being hired he was promised overtime which he said was important to him because of the distance of the job away from his home. A company witness admitted telling Lyons the cutter grinding department was working overtime, but denied any promise.

After working 2-1/2 weeks without overtime or any early prospect of it, claimant quit the job in Indianapolis. On his return to Trenton, he reapplied for unemployment compensation. At a hearing before a referee, he gave this testimony:

"*A.* Well, sir, see, when you have compensation you don't make too much money, so we heard about the Indianapolis plant going down there and we went down there; and Pete Janis and I, this fellow sitting over here, and we went down there and talked to the employment man. He said, 'Yes, we are hiring cutter grinders. You a cutter grinder?' I said, 'Yes. I worked in Trenton plant.' I said, 'First, I want to know what I'm going to get and everything else?' So he told us what we would get and he called the general foreman out, the cutter grinder. That's Mr. Moore, Bill Moore. He promised us 9 hours a day for 6 days a week. I says, 'I can take the job,' and.

I knew I could keep up to home, you know, because I got a large family. I got 7 children and my wife and myself. So I decided, well, we'll take that there. Well, they never fulfilled the thing, and Mr. Janis, he got sick. He had to have an operation so it just doubled the thing on me. He was driving his car until his car went 'bang!' and my car—I got a 1950 Packard and it's gone. It's no good. I used 6 gallon of oil going up there and 6 gallon coming back. It's only 280 some miles. I just couldn't make it, that's all."

As frosting on the cake of his trouble, Lyons got word from home that his 15-year-old son had left home to look for work.

The referee who heard the case held that claimant "left his work of his own volition, his own choice and election," that there was no express agreement on the part of the employer to give him overtime work, and that claimant was disqualified for benefits under section 29(1)(a)(1) for the duration of his unemployment.

The appeal board affirmed the referee's decision *in toto*.

On appeal in the nature of certiorari, the circuit judge reversed the decision of the appeal board. The preliminary reasoning in his opinion was:

"The claimant did not have to go to Indianapolis, Indiana, 273 miles away, to seek work. In desperation he tried to earn enough down there to support his family. Because of this energetic action, it is now held that he voluntarily left his work without good cause attributable to the employer under section 29(1)(a)(1), and that therefore any wages earned prior to such leaving shall not be used as a basis for computing or paying benefits for any period subsequent to the time of said disqualifying act. If claimant had just sat, as he had a right to do under the circumstances, he would be all set. Since he went to Indianapolis and found it impossible to con-

tinue, he is sunk. Such a result should be avoided if possible."

The logic of this reasoning would suggest that the circuit judge did not believe that claimant's leaving the job was "voluntary." The reversal, however, the circuit judge pinned squarely to a holding that the disqualification provision of section 29(1)(a)(1) did not apply to workmen outside of Michigan, or to plants outside of Michigan.

This led appellant, Michigan employment security commission, to suggest the following as the sole question to be decided:

"Is section 29(1)(a)(1) of the employment security act, which disqualifies an individual if he leaves his work voluntarily without good cause attributable to his 'employer' or 'employing unit,' applicable to separations from work performed outside the State of Michigan?"

Whereupon, appellee-claimant added a second one:

"Where an individual accepts employment under circumstances where a refusal would not disqualify him for unemployment compensation benefits, does his leaving necessarily constitute a voluntary leaving without good cause attributable to his employer or employing unit?"

We believe appellant Michigan employment security commission's question must be answered affirmatively. The disqualification does apply to employment outside Michigan.

Nothing in the language of the disqualification section itself supports a contrary view. It says:

"Sec. 29. (1) An individual shall be disqualified for benefits:

(a) For the duration of his unemployment in all cases where the individual has: (1) Left his work voluntarily without good cause attributable to the

employer or employing unit." CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531).

Further, the contrary interpretation is in conflict with those provisions of the act which recognize the mobility of labor and provide for reciprocal agreements between States for 1 State to pay accrued benefits to an employee after he has moved to another State and become unemployed there.[2]

Further, such an interpretation is in obvious conflict with the basic scheme of the act. See section 42, subd (2) (CLS 1956, § 421.42, subd [2] [Stat Ann 1960 Rev § 17.545, subd (2)]). Many employees of Michigan firms work temporarily outside the State, or partly within and partly without the State. To hold that the disqualification section is not applicable to them when they are employed across State lines would result in imposition of far more stringent standards of conduct on employees working wholly in Michigan than those whose employment takes them outside the State.

We recognize that the circuit judge relied upon the specific wording of the statutory definition of "employing unit" in section 40.[3]

---

[2] See CLS 1956, § 421.11, subd (g) (Stat Ann 1960 Rev § 17.511, subd [g]).—Reporter.

[3] " 'Employing unit' means any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee or successor thereof, or the legal representative of a deceased person, which has or subsequent to this amendatory act, had in its employ 1 or more individuals performing services for it within this State. All individuals performing services within this State for any employing unit which maintains 2 or more separate establishments within this State shall be deemed to be employed by a single employing unit for all the purposes of this act. Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this act, whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of the work." CLS 1956, § 421.40 (Stat Ann 1960 Rev § 17.542).

A careful reading of this section does not result in the conclusion that it must be read as holding the disqualification clause inapplicable to out-of-State employment. It does say that for an employing unit to be covered by the Michigan act, it must have some employees who do work for it "within the State." This is customary and perhaps necessary language when the Michigan statute also levies a tax upon the employing unit as does this statute. But this definition does not by its language or necessary implication require us to adopt an interpretation of section 29(1)(a)(1) which is so obviously out of accord with the balance of the act.

As to the second question, however, we find ourselves in thorough agreement with the circuit judge's preliminary thoughts and his ultimate result. The crucial question is whether or not on these facts claimant "left his work voluntarily without good cause attributable to the employer or employing unit" within the meaning of section 29(1)(a)(1) of the Michigan employment security act.

At the outset, we read the facts in this case and the definitions of the word "voluntary" with the basic purposes of the Michigan employment security act in mind. Section 2 contains this great declaration of policy:

"The legislature acting in the exercise of the police power of the State declares that the public policy of the State is as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this State. Social security requires protection against this hazard of

our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own,* thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this State." CL 1948, § 421.2 (Stat Ann 1960 Rev § 17.502). (Emphasis supplied.)

We also note that the other paragraphs of section 29 provide for disqualification for "misconduct" or "intoxication" and for failing "without good cause" to apply for "suitable work," or accept it when offered.

Thus the general purpose section of the statute, and all of the other disqualification provisions, are consistent in seeking to provide unemployment benefits for persons unemployed through no fault of their own.

Still another provision of the same section 29 defines the social policy of the State in relation to what constitutes "suitable work" (1)(a)(5):

"In determining whether or not any work is suitable for an individual, the commission shall consider the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and *the distance of the available work from his residence."* (Emphasis supplied.)

With these provisions in mind, it is our opinion that there is plainly no fault involved in a man who has a wife and 7 children living in Trenton in the Detroit area quitting a job 273 miles away when, aft-

er trying it for 2-1/2 weeks, he found that his earnings could not support him and his family in separate cities and pay the cost of transportation back and forth each weekend.

This view, however, important as it is to this case, does not completely resolve our problem under the present version of section 29(1)(a)(1). The original version of section 29(1)(a)(1) explicitly reiterated the "unemployed through no fault" doctrine by providing disqualification when an employee "left work voluntarily without good cause." (PA 1936 [Ex Sess], No 1, § 29[a].) But in 1941, PA 1941, No 364, amended section 29(a)(1) so as to make the relevant portion read "voluntarily without good cause attributable to the employer." By so doing, Michigan joined a minority of States[4] in restricting "good cause" to something related to the employment—but retained the requirement that the leaving of work must have been done "voluntarily."

In seeking the meaning of this last word, we make no attempt to draw a precise line between those philosophers writing on freedom of will who seem to imply that man is the servile creature of circumstance, and those bolder souls who appear to proclaim that a man of true character can control all destiny to his purpose. But customary usage of language and prior employment by the courts provide some guidance.

Webster supplies the following as its first 2 definitions of "voluntary":

"1. Proceeding from the will, or from one's own choice or full consent; produced in or by an act of choice; as, *voluntary* action.

"2. Unconstrained by interference, unimpelled by another's influence; spontaneous; acting of oneself or itself; free. 'Our *voluntary* service he requires.'

---

[4] Kempfer, Disqualifications for Voluntary Leaving and Misconduct, 55 Yale LJ 147.

Milton.[5]  Webster's New International Dictionary (2d ed), p 2858.

The courts' most frequent occasion to deal with the word "voluntary" comes in relation to the admission of confessions in criminal trials. Repeatedly and unanimously, courts have held that confessions induced by compulsion and duress were not admissible because not voluntary. *Chambers* v. *Florida,* 309 US 227 (60 S Ct 472, 84 L ed 716); *McNabb* v. *United States,* 318 US 332 (63 S Ct 608, 87 L ed 819); *People* v. *Hamilton,* 359 Mich 410.

In 2 leading cases concerning unemployment disqualification clauses, we find comment on the nature of the word. The Minnesota supreme court said:

"An act of necessity may not be a voluntary act. See *Duncan* v. *Preferred Mut. Acc. Assn.,* 36 NY St Rep 928 (59 NY Super [27 J & S] 145, 13 NYS 620); *Town of Cleveland* v. *Industrial Comm.,* 232 Wis 147 (286 NW 558). We cannot escape the conclusion that where, as here, an employee is impelled because of sickness and disease to terminate employment because continuance thereof would endanger his health and personal welfare, such termination is an involuntary rather than a voluntary act on the part of the employee within the meaning of § 4337–27(A).[6]" *Fannon* v. *Federal Cartridge Corporation,* 219 Minn 306, 311, 312 (18 NW2d 249, 252, 158 ALR 389).

In *Sturdevant Unemployment Compensation Case (Bliley Electric Co.* v. *Unemployment Compensation Board of Review),* 158 Pa Super 548, 556 (45 A2d 898, 903), the court said:

"Willingness, wilfulness, volition, intention reside in 'voluntarily.' "

And in *Thomas* v. *Employment Security Commission,* 356 Mich 665, 669, this Court recently, in con-

---

[5] Paradise Lost, Book 5, line 529.—Reporter.

[6] Mason's Minn St 1944 Supp.—Reporter.

struing the word "voluntarily," held claimant's "purpose or intent" to be controlling.

See, also, annotations 165 ALR 1382; 13 ALR2d 874.

We take it all would concede that a decision to refuse or to leave work compelled by law,[7] or by the overwhelming force of a hazard of nature,[8] or the equally awesome power of serious illness,[9] would not constitute a "voluntary" quit. Nor do we believe that a quit compelled by the iron hand of physical and economic circumstance is "voluntary" either.

The physical circumstance in this case is the fact that the job was 273 miles from claimant's home and family. Cases involving distance and transportation problems in relation to refusing or leaving work are not novel. Many such cases have held refusal or leaving justifiable on the grounds of infinitely less physical distance than is involved here.[10]

In *Industrial Commission* v. *Lazar*, 111 Colo 69 (137 P2d 405), the Colorado supreme court held 2 miners who were offered mining jobs 175 miles away from their homes and families were not disqualified for refusal of the jobs.

And we find none where the administrative agencies or courts have construed the disqualification

[7] V 6 No 5, Benefit Series, Unemployment Compensation Interpretation Service (U S Social Security Board), No 7983–RI A (induction into army); V 6 No 5, Ben Ser, No 7971–Hawaii A (evacuation by military authorities); V 6 No 5, Ben Ser, No 7939–NJ A (statute abolishing home work).

[8] V 2 No 12, Ben Ser, No 2323–Mich A (lumberjack forced by blizzard to quit cutting timber).

[9] *Fannon* v. *Federal Cartridge Corporation, supra* (allergy to gunpowder); *Miller Unemployment Compensation Case (Bliley Manfg. Corp. v. Unemployment Compensation Board of Review)*, 158 Pa Super 570 (45 A2d 908) (nervous exhaustion related to nature of work).

[10] *Claim of Canale*, 277 App Div 960 (99 NYS2d 634) (18 miles and $2.35 per week added transportation cost); V 6 No 6, Ben Ser, No 8028–Mass A (transportation time 3 hours); V 7 No 1, Ben Ser, No 8356–NC A (12 miles and no ride); V 5 No 3 Ben Ser, No 7139–Pa A, aff'd Pa Bd of Rev, B–44–2RB–313 (unpublished) (50 miles and no transportation).

clauses of an employment security statute as imposing the duty of accepting or continuing employment 273 miles from his home and family.

The compelling economic circumstances bear upon the question of overtime as it related to claimant's ability to maintain his family and himself in separate cities and get back and forth between them. On the only dispute of facts in this case, the referee and appeal board found that claimant was not "guaranteed" overtime. We accept this finding as not being against the great weight of the evidence. *Michigan Tool Co.* v. *Employment Security Commission,* 346 Mich 673; *Palmer* v. *Unemployment Compensation Commission,* 310 Mich 702 (158 ALR 909); CL 1948, § 421.38 (Stat Ann 1960 Rev § 17.540). Obviously, however, claimant had hoped for more hours of work (and hence more pay) than he got. Obviously, too, he had hoped his friend's car would continue to serve to transport them 273 miles to Indianapolis, and 273 miles back home each weekend. Disappointed on both these scores, he concluded, "I just couldn't make it, that's all"—a conclusion which perhaps a wiser or less daring man might have reached earlier, and a conclusion which nothing in this record disputes.

In construing a similar disqualification clause, the superior court of Delaware took judicial notice that, where a claimant's earnings had shrunk to $1,000 a year, he was not able to earn a living wage at his job and hence that his leaving it was not a voluntary quit. *Brainard* v. *Unemployment Compensation Commission of Delaware,* 45 Del 528 (76 A2d 126).

See, also, *Setta* v. *ESC and Chrysler Corp.,* Michigan Wayne circuit court, 5 CCH Unemployment Insurance Service, § 8744.

In an English case remarkably like our own, the umpire held that the claimant was not able to find suitable housing for his family in London 185 miles

from their home, and was therefore not disqualified. In view of the report's brevity and relative inaccessibility, we set it out in full:

"*CASE* No 455/25 (11/3/1925).—Section 8(2) of the principal act. Employment left voluntarily.

"Fitter Left Job Away From His Home—Unable to Continue to Support Two Homes After Nine Months' Trial—Wife Expected Early Confinement.

"The applicant, a fitter, who had been employed for 9 months, left his employment on the 19th January, 1925, and his claim for benefit was disallowed under the provisions of section 8(2).

"He stated that he took up the job, which was in London, on the understanding that the employers would find him a house. He removed from Leeds, where he had a house, with his wife and 2 children, to London, but after 2 months, during which time he and his family occupied 1 room, no house had been obtained. His wife and children were then obliged to return to their former home, as he could not afford to keep them with him. He, however, continued his efforts to secure a house, but without avail, and after a period of 9 months he decided to return to his home, as he could not continue to keep 2 homes indefinitely.

"The employers, on the other hand, stated that no definite promise to secure the applicant a house had been made. They had made efforts to assist him in finding a house, but owing to the general housing shortage they were unsuccessful. The applicant's work was satisfactory and he could have continued in the employment had he wished.

"Recommended by the court of referees that the claim for benefit should be disallowed. The court held the opinion that the employment was suitable for the applicant as it was in his own occupation and standard wages were paid. They were therefore of the opinion that he was not justified in leaving voluntarily without having obtained any definite promise

of work near his home. The court gave the applicant leave to appeal to the umpire.

"He stated on appeal that he left his employment because he was unable to keep himself in lodgings and at the same time support his wife and family at home. His wife was confined on the 18th February, 1925.

"DECISION.—'On the facts before me my decision is that the claim for benefit should be allowed.

" 'This case may be allowed in accordance with the principle of decision 5387 (O.W.D.) (Appendix to Pamphlet No 19). This is a stronger case, as the applicant's wife expected to be confined shortly.' " 4 Gt Brit, Umpire Benefit Decisions (1925), 76.[11]

[11] As indicated below, both the English statutory provisions and case interpretations are generally liberal as compared to American counterparts:

"611. Where it appears that a claimant has left his employment voluntarily he is subject to the like disqualification as in the case of misconduct unless he proves that he had just cause for leaving. The main grounds upon which it has been held that just cause was shown are breach of contract of service by the employer or the imposition of new conditions of service unfavourable to the claimant, and the claimant's personal circumstances. He is required, as a general rule, to exhaust all reasonable means of getting his grievance remedied before leaving his employment, and if the conditions of his employment are governed by agreement between the employer and the association of which he is a member he should report the matter to his association so that his grievance may be investigated and remedied by negotiation.

"If employment or the conditions of employment are in themselves suitable a claimant has not just cause for leaving merely because he is required or requested to do so by his trade union or, in the case of a young person, by his parents. A person who voluntarily accepted employment with knowledge of the wages and conditions is not justified in leaving it without notice or reasonable trial merely because he could, without incurring disqualification, have refused it as unsuitable at the time when he in fact accepted it.

"612. Where mitigating circumstances are shown, either in the case of employment lost through misconduct or voluntarily leaving without just cause, the period of disqualification may, in the discretion of the court of referees or the umpire, be reduced to any period less than 6 weeks. Where the period of employment lost in either case is definitely ascertained, the disqualification may be limited to the like period. The punishment inflicted after conviction in criminal proceedings relating to the subject-matter of misconduct may not be taken into account in determining the period of disqualification.

"(iv.) *Failure to accept or apply for suitable employment.*

"613. If, on a claim for benefit, it is proved by an officer of the ministry of labour:—

For a factory worker with 7 children and a home in the Detroit area to take a job 273 miles distant in Indianapolis is to attempt something almost impossible. With his optimistic hopes of excess earnings dashed, and his means of transportation removed, the "almost" was eliminated.

We hold that the word "voluntary" as used in section 29(1)(a)(1) must connote a decision based upon a choice between alternatives which ordinary men would find reasonable—not mere acquiescence to a result imposed by physical and economic facts utterly beyond the individual's control.

This record demonstrates a most unusual "purpose or intent" (see *Thomas, supra,* p 669) on the part of claimant to seek employment. It contains no facts at all which demonstrate any purpose or intent to leave work except as compelled to by physical and economic circumstances which would similarly compel any reasonable man similarly situated.

The decision of the referee and the appeal board was either based upon a misconstruction of the term "voluntarily," or it was clearly against the great weight of the evidence.

"(1) that the claimant, after a situation in any employment which is suitable in his case has been notified to him by an employment exchange or other recognised agency or by or on behalf of an employer as vacant or about to become vacant, has without good cause refused or failed to apply for that situation or refused to accept it when offered to him; or

"(2) that the claimant has neglected to avail himself of a reasonable opportunity of suitable employment; or

"(3) that the claimant has without good cause refused or failed to carry out any written directions given to him by an officer of an employment exchange with a view to assisting him to find suitable employment, being directions which were reasonable having regard both to the claimant's circumstances and to the means of obtaining that employment usually adopted in the district in which the claimant resides, the claimant is disqualified for receiving benefit for a period of 6 weeks or such shorter period, and beginning as from such date, as may be determined by the court of referees or the umpire." 34 Halsbury's Laws of England (2d ed), pp 526–529.

The circuit judge reached the right result for the wrong reason. In such a situation, we do not reverse.

The order should be affirmed. No costs, public questions being involved.

Smith and Souris, JJ., concurred with Edwards, J.

Carr, J. Plaintiff worked as a cutter grinder in the Trenton Engine Division plant of defendant Chrysler Corporation from January 10, 1957, to and including July 15th following when he was laid off for lack of work. His application for unemployment benefits was granted and he was given a weekly benefit rate of $55, potentially payable for 24 weeks, the determination being based on 36 credit weeks earned. After drawing several benefit payments he sought work as a cutter grinder at the Indiana plant of Chrysler Corporation, at Indianapolis, and was hired there on August 19, 1957.

The record discloses that plaintiff worked 40 hours during his first week at Indianapolis. His time during the second week was reduced by 1/2 day which he took off for the purpose of returning to his home in Trenton. During the third week he quit his employment at the end of the third day, having worked 24 hours during said week. He gave as his reason for quitting his job that he was leaving the city of Indianapolis. Following his return to Trenton where his family resided he sought further unemployment compensation but his application therefor was denied by the defendant commission. He sought a redetermination, and the first finding was sustained. He then appealed to a referee pursuant to the Michigan employment security act.* Testimony

---

* PA 1936 (Ex Sess), No 1, as amended (CL 1948 and CLS 1956, § 421.1 *et seq.* [Stat Ann and Stat Ann 1957 Cum Supp § 17.501 *et seq.*]).

was taken in Detroit, Michigan, and also in Indianapolis. After consideration thereof the referee concluded that plaintiff was disqualified from receiving benefits under section 29(1)(a)(1) (CLS 1956, § 421.29 [Stat Ann 1960 Rev § 17.531]) for the reason that he had left his work in the Indianapolis plant "voluntarily without good cause attributable to the employer."

The action of the referee was appealed by plaintiff to the appeal board of the employment security commission, which affirmed. Plaintiff then sought review by certiorari in the circuit court of Wayne county where the matter was heard before the Honorable Halford I. Streeter, circuit judge. Judge Streeter rendered an opinion holding that plaintiff was not disqualified from receiving unemployment compensation on the ground that the statutory provision involved had application only to services within the State of Michigan. Accordingly the order of the appeal board was reversed. The defendant Michigan employment security commission, represented in the proceeding by the attorney general of the State, has appealed to this Court claiming that the decision of the circuit judge was based on an erroneous interpretation of the statute.

In writing for affirmance of the order entered in the circuit court Mr. Justice EDWARDS concludes that the reason assigned as the basis of the reversal of the appeal board was not well-founded, and that the application of the disqualifying clause of the statute here in question is not limited to services performed within this State. With that conclusion we are in accord for the reasons advanced by the attorney general in his brief and in substance accepted by Justice EDWARDS. However, Justice EDWARDS would uphold the action of the circuit court on the ground that plaintiff did not *voluntarily* quit

his employment at the Indianapolis plant of Chrysler Corporation.

We believe that the proofs submitted to the referee and considered by him and by the appeal board do not justify such disposition of the cause.   The legislature has prescribed in clear and unambiguous terms certain specified grounds for disqualification for the receipt of unemployment compensation.   As stated in *Thomas* v. *Employment Security Commission,* 356 Mich 665, 669:

"It is not the proper function of the court to amend the statute to broaden or extend the disqualifications fixed, in plain language, by the legislature.   Whether one in claimant's situation ought to be disqualified is a question of policy for the legislature, not a judicial question to be determined by the court."

It is equally obvious that the court may not disregard a disqualification declared by the statute and applicable under the established facts.

The facts in the case are somewhat unusual and the determination of the issue before us must necessarily be based on the proofs.   It must be borne in mind in this connection that under the statute (CLS 1956, § 421.38 [Stat Ann 1960 Rev § 17.540]) the circuit court may reverse a decision of the appeal board "upon a question of fact only if it finds that said decision of the appeal board is contrary to the great weight of the evidence."

The referee to whom the controversy was submitted summarized his conclusions in the following language:

"Carefully considering all of the facts as submitted in this case, the referee finds that at the time of claimant's hire, he was not guaranteed overtime pay as an inducement or condition for his acceptance of said employment.   The fact that the department into which he was being hired was then working on

an overtime basis, and the claimant assumed or 'understood' that he may also be able to work overtime, is held not determinative of the issue, in the absence of an express promise and agreement on the part of the employer to provide claimant with such an overtime schedule of work.

"If it is considered that the claimant terminated his employment because of his problem at home, as the primary reason, then it must also be concluded that the leaving was not for reasons for which the employer was responsible.

"In either event, it is held that the claimant left said employment without good cause attributable to the employer, and the redetermination issued by the commission must be sustained."

The appeal board agreed with the findings of fact made by the referee and with the order affirming the action of the Michigan employment security commission. After referring at some length to said findings, it was said in the opinion filed:

"The above quoted statement of the claimant and the entire record establishes that the claimant's leaving was voluntary and for purely personal reasons. We find, therefore, that the referee properly held that the claimant's leaving was voluntary and without any good cause attributable to the employer. It is accordingly our finding that the referee's decision holding that the claimant's separation was under disqualifying circumstances is in accord with and fully supported by the facts and law and cannot be disturbed."

As before noted, when plaintiff left his employment at the Chrysler Indianapolis plant he gave as his reason for so doing that he was "leaving the city". Subsequently, in pressing his claim before the defendant commission, he made the following statement in his own handwriting over his signature:

"I was laid off at Chrysler-Trenton on 7-15-57 due to lack of work. I was hired by Chrysler in Indi-

anapolis, Indiana, on 8-18-57 as a cutter grinder at the same rate of pay. My wife and 7 children remained in Michigan because it was my understanding that the Indiana job would only be temporary as my seniority would hold at Chrysler-Trenton. I did not want to sell my home and move my family to Indiana for this reason. However, due to family difficulties, I was needed home and had to quit my job after 3 weeks duration.

"I understand the above statement."

On the hearing before the referee plaintiff advanced the further claim that at the time he was given employment at the Chrysler Indianapolis plant he was told by the representative of the company with whom he dealt that he would, in addition to the regular hours of work, have overtime. He stated that during his stay in the plant, approximately 2-1/2 weeks, he was not given overtime, and that for such reason he became dissatisfied with his work. In effect, he asserted a breach of an agreement made at the time he was hired. However, the referee and the appeal board found that no promise was made to him, or agreement arrived at, giving plaintiff assurance as to overtime pay. At the time his application for employment was accepted he was accompanied by a friend who had also been employed at the Trenton plant and was seeking work at Indianapolis. This man, Peter Janis, testified before the referee as follows:

"*Q.* Were you present when Mr. Lyons was discussing the job with the employment man?

"*A.* Yes, I was.

"*Q.* Did the employment man make any offer or promise of work at 9 hours a day, 6 days a week?

"*A.* No.

"*Q.* Didn't you tell him you came down there for that reason?

"*A.* No. We asked for the job as cutter grinders."

Further testimony of witness Janis indicated that he fully understood the situation from the conversation with defendant Chrysler's foreman. The latter, in explanation of the policy of the company and of the department in which he was working, testified:

"When a new employee comes into the department his name is put in the bottom of the equalization of hours list. At the time, I'm not too clear on how many employees we had but he would, and along with Mr. Janis would, go to the bottom of the list. On Saturday, as I said before and on Sunday, we work a certain percent of our people, maybe out of, take for example maybe out of 50 people who is on my payroll I might work 20 of those people on Saturday and the same people on Sunday so it would probably take 2 to 3 or maybe 4 weeks for Mr. Janis' and Mr. Lyons' name to get to the top of the overtime list, which at that time they would be eligible for overtime. Since Mr. Lyons was only there 2-1/2 weeks approximately I can see why he hadn't gotten any overtime. We were probably working, I'm not too sure, 9 hours at the time that I hired Mr. Lyons, but the picture on our overtime can change from day to day so no way shape or form was any guarantee made. I probably did say at the time, 'We're working lots of overtime.'"

It further appears in the proofs that plaintiff was employed at the Indianapolis plant at an hourly rate of $2.72, slightly higher than the pay that he had been receiving previously at Trenton. In addition there was a living allowance of 16¢ per hour prior to September 1, 1957, and 19¢ per hour thereafter. Because of his leaving his work midway in the third week he did not receive overtime. His loss of 1/2 day during the second week resulted from his taking the time off in order to return to Trenton with Mr Janis. It is a fair inference that had plaintiff remained at Indianapolis he would have received, in due time, in accordance with the policy of the divi-

sion in which he was working, desired overtime, but according to his testimony he was not satisfied to await his turn.

It is of further significance that other former employees at the Trenton plant had obtained work in the Indianapolis plant, which fact the record indicates was one reason why plaintiff and Mr. Janis likewise sought employment there. It clearly appears from the proofs that both men discussed the situation at Indianapolis with their fellow employees, and presumably sought employment in reliance, to some extent at least, on the information so received. It is clear from the testimony of Mr. Janis that there was no misunderstanding on his part as to his exact status and that of plaintiff.

Some emphasis has been placed by counsel for plaintiff on their claim that plaintiff had he been *tendered* employment at Indianapolis would not have been required to accept it. Such is not the situation presented by the record in this case. Plaintiff sought the employment and received it in accordance with his application therefor. He worked for a limited time and then, as clearly appears from the proofs, left Indianapolis and returned to Trenton for purely personal reasons. The finding of the referee and of the appeal board in this particular is fully supported by the proofs. Obviously plaintiff concluded that he would rather draw unemployment compensation than to continue working in Indianapolis.

Of significance also is the fact that Mr. Janis was compelled to leave work at the end of the second week because of illness and the necessity of undergoing a serious operation. Apparently he and plaintiff had planned on returning to Trenton each weekend if overtime work did not interfere. On such trips they were apparently operating on a "share the ride" plan. The following excerpt from the testi-

mony of plaintiff is significant as bearing on his reasons for leaving Indianapolis:

"*Q.* Now, if Mr. Janis had not become ill and had he continued to work there so that you would have a riding partner, would you have continued to work?

"*A.* I don't understand that. Explain it.

"*Q.* You advised earlier that Mr. Janis' leaving had bearing on your decision to leave the employ, because you had a car and it wasn't very new, and it was expensive to drive to and from that area. Now, my question is: If Mr. Janis had not become ill and discontinued working because of his illness when he did, would you have continued to work there?

"*A.* Yes, sir, I would have continued working there.

"*Q.* You would have continued to work there?

"*A.* Yes, sir.

"*Q.* So one of the chief reasons for leaving is Mr. Janis was not going to be able to ride with you or share the ride or whatever the program was between you:

"*The Referee:* Is that correct?

"*The Witness:* Yes, sir."

The practical situation presented is that the employer did not in any respect breach its agreement with plaintiff at the time the latter's application for employment was accepted. Plaintiff did not quit because of the condition of his health or because of any dissatisfaction with the work that he was doing, aside from the lack of overtime during the initial weeks of his employment, and he was not entitled to insist that he be given a preference as to overtime to the prejudice of other employees entitled thereto under the company policy. His testimony that he would have continued to work had Mr. Janis been able to remain in Indianapolis clearly suggests that he did not quit his employment for good cause attributable to his employer.

Plaintiff's claim to the defendant commission that there were difficulties in his home at Trenton that, impliedly, required his presence there apparently referred to the attitude of his 15-year-old son who desired to go to work. No detailed explanation of the situation was made and we are left to conjecture and speculation with reference to the exact situation. There was no showing before the referee that the boy had left home, or that some gainful employment on his part would not have been proper. Plaintiff's statement that he would have continued to work had Mr. Janis remained with him indicates that he did not consider the home situation as imperatively demanding his presence there or that the mother was incapable of properly controlling the children. Neither does it appear that the home difficulties, whatever may have been their precise nature and extent, did not exist prior to plaintiff's making application for employment at Indianapolis, or were in any way aggravated by his absence from the home during the days of his employment.

Doubtless the illness of Mr. Janis and the consequent interruption of their trips home over weekends, if not given overtime on Saturday and Sunday, complicated to some extent the matter of transportation for plaintiff. He claimed that his automobile was old and not operating efficiently. There is no proof, however, that the difficulties, whatever they may have been, could not have been remedied, nor does it appear that plaintiff sought to make other arrangements for transportation. We may not assume that, even without the help of Mr. Janis, plaintiff could not have made reasonable visits to his family in Trenton.

The order of the appeal board was not "contrary to the great weight of the evidence." From our examination of the testimony of the witnesses in the case

as set forth in full in the transcript returned to this Court as a part of the original record we are led to the conclusion that the evidence considered by the referee and the appeal board fully supported the findings of fact and the conclusions reached. Plaintiff voluntarily left his employment without good cause attributable to his employer. He did so because he did not wish to stay in Indianapolis during days of each week on which he was employed, without his friend and co-worker Mr. Janis. Doubtless he considered that he would be better satisfied to return to his home and seek the restoration of unemployment compensation benefits. Such was obviously the course that he chose to follow. As before pointed out, the action was not impelled by the condition of his health or any other circumstances that rendered it impossible or impracticable for him to continue his employment in the Indianapolis plant. Presumably he considered that he was justified for the reasons urged by him in leaving his employment. Such reasons, however, were wholly personal and the fact is obvious that his action was voluntarily taken without good cause attributable to the employer. Such being the situation, the disqualifying provision of the statute clearly applied, and required the order entered by the appeal board of the employment security commission.

The situation is not at all analogous to that presented in *Fannon* v. *Federal Cartridge Corporation,* 219 Minn 306 (18 NW2d 249, 158 ALR 389), to which counsel for plaintiff have referred. There the plaintiff terminated her employment with the defendant because of illness resulting from conditions arising from the employment. She was, it appears, allergic to gun powder, in consequence of which it became necessary for her health that she discontinue employment in defendant's ammunition factory. It was held in view of the factual situation presented that

she was not disqualified under the Minnesota statute from receiving unemployment compensation. Decisions from other States indicating the interpretation of the particular statutory provisions involved will be found in annotations, 158 ALR 396, and 165 ALR 1382.

Under the facts here presented a proper interpretation of the Michigan statute requires a holding that plaintiff was disqualified from receiving unemployment benefits. The purpose of the act is set forth clearly and specifically in section 2 thereof (CL 1948, § 421.2 [Stat Ann 1960 Rev § 17.502]). It appears that it was the legislative policy to guard against *involuntary* unemployment and to establish unemployment reserves for the benefit of persons who are out of work through no fault of their own. The provisions of the act must be construed in accordance with the general purpose sought to be served thereby. Squarely in point is the terse statement of the supreme court of Ohio in *Chambers* v. *Owens-Ames-Kimball Company,* 146 Ohio St 559, 570 (67 NE2d 439, 165 ALR 1373), that:

"Unemployment compensation is based upon the philosophy that employment and not unemployment is the goal to be attained; that payments are always limited to persons who are involuntarily unemployed; and that labor, as well as industry, must cooperate in all reasonable measure in the proper administration of the law."

An order will enter reversing and setting aside the order entered in circuit court, and affirming the action of the appeal board of the Michigan employment security commission. A question of statutory interpretation being involved, no costs are allowed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

BLACK, J. (*concurring*). Two opinions of this case are proposed. One stands for affirmance. The other for reversal. One concludes that the decision of the appeal board "was either based upon a misconstruction of the term 'voluntarily,' or it was clearly against the great weight of the evidence."[1] The other arrives at conclusion that "the disqualifying provision of the statute clearly applied, and required the order entered by the appeal board of the employment security commission." Thus each scribe votes—with his supporters—to affirm or reverse upon premise that the appeal board decided a question of law. At this junction I get off the fully segregated train. It goes nowhere, at least toward any station of worthy precedent.

Whether the plaintiff employee did or did not voluntarily leave his employment, without good cause "attributable to his employer," became under the proofs an issue of fact for administrative determination. This surely is proven by the conflicting opinions of Brothers EDWARDS and CARR. The record of testimony, detailed by them as in stirring jury arguments for and against an award of benefits to plaintiff, would in my view justify a jury verdict either way and, by that hitherto acceptable test, fully warrants this particular administrative decision. The appeal board concluded, well within the range of proof before it:

"The above-quoted statement of the claimant and the entire record establishes that the claimant's leaving was voluntary and for purely personal reasons. We find, therefore, that the referee properly held that the claimant's leaving was voluntary and without any good cause attributable to the employer.

---

[1] This alternative conclusion, taken either way by disjunction, is a proposed ruling of law distinguished from determination of an issue of fact. See discussion in *Jones* v. *Eastern Michigan Motorbuses,* 287 Mich 619, 648.

It is accordingly our finding that the referee's decision holding that the claimant's separation was under disqualifying circumstances is in accord with and fully supported by the facts and law and cannot be disturbed."

I reaffirm the rule which limits the scope of judicial review of administrative decisions. See *Peaden v. Employment Security Commission,* 355 Mich 613, 629, and the respective opinions of Justices Smith and Voelker in *Knight-Morley Corporation* v. *Employment Security Commission,* 350 Mich 397, 411, and *Jerry McCarthy Highland Chevrolet Co.* v. *Department of Revenue,* 351 Mich 558. The appeal board's determination of plaintiff's claim is legally akin to the verdict of a jury upon a like issue of fact, and I refer to Mr. Justice Smith's comparison—in *Knight-Morley*—of the administrative function with that of the jury province. He said, and I subscribed:

"We conclude that under the statute here before us our scope of review is no broader than that exercised by us in setting aside a jury's verdict, our latitude no greater. It may, indeed, due to the differing considerations of skill, policy, and function of the fact-finding tribunals in the governmental process, be far narrower." (p 421)

The statute "before us" in *Knight-Morley* is the same statute which confronts us now. The only noteworthy difference between the 2 cases is that the appeal board decided *Knight-Morley's* question of fact *for* the plaintiff employee; whereas in this case the board decided a visibly identical question *against* the plaintiff employee. If it was right to affirm the appeal board in the one case, so it is right to affirm the board in the latter.

I join no team which approaches review, of a decision by the appeal board, with seeming askant eye when that decision happens to favor the defendant

employer. And I stand aloof from others who, by their consistent writing, view with apparent suspicion any decision of the appeal board which turns out in favor of the plaintiff employee. I prefer to stand upon *Aragon's*[2] canonical rule of administrative law, quoted from *Peaden* above (p 624):

"Here, as in *National Labor Relations Board* v. *Hearst Publications, Inc.* (1944), 322 US 111, 131 (64 S Ct 851, 88 L ed 1170), the question presented 'is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially.' To sustain the commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. The 'reviewing court's function is limited.' All that is needed to support the commission's interpretation is that it has 'warrant in the record' and a 'reasonable basis in law.' "

As in *Aragon,* we deal here with administrative application of the disqualification provisions of an unemployment compensation act. The judicial function "is limited." The circuit court does not hear and consider *de novo,* with right of rendition of a new administrative verdict. Neither does this Court. All that is necessary to conclude judicial inquiry is appearance in the record of some evidence upon which it may be said that there is a legally rational basis for the scrutinized decision of the appointed administrative authority. This claimant's handwritten statement—yes, just that statement—constitutes such evidence.[3]

---

[2] *Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 US 143, 153, 154 (67 S Ct 245, 91 L ed 136).—REPORTER.

[3] The statement is quoted verbatim in Mr. Justice CARR's opinion, *ante,* 220, 221.

Professor Cooper, of the Law School of the University of Michigan, noted recently the visible trend of our decisions in administrative cases, which trend I would maintain until that day comes when courts of original jurisdiction are both equipped and authorized, fully as they should be, to decide such controversies as by law are presently committed to the judgments of statutory administrators. He said (7 Wayne L Rev, p 1):

"While none of the Michigan Supreme Court's decisions in the 12-month period under review lay down general principles of far-reaching significance in the administrative law field, the general tenor of the Court's rulings indicates a departure from the philosophies that characterized the Court's rulings 10 years ago, *and suggests a general trend toward a philosophy of noninterference with administrative adjudication.*"

I hold that the circuit court, having been called upon to review this administrative record via the limitations of certiorari, attempted to substitute its judgment of factual issues for that of the appeal board. This was error. My vote to reverse is cast accordingly.

KAVANAGH, J., concurred with BLACK, J.