DILLON *v.* LAPEER STATE HOME AND TRAINING SCHOOL.

OFFICERS — DISCHARGE OF CIVIL SERVICE EMPLOYEE — EVIDENCE — NOTICE OF DISMISSAL.

> Discharge of civil service employee at State institution as attendant nurse for conduct unbecoming a State employee *held*, invalid under record presented for lack of substantiation to connect plaintiff with the losses of any property as claimed, per DETHMERS, C. J., and KELLY and KAVANAGH, JJ., and because the notice of dismissal lacked specificity as to articles taken and the dates when taken, per SMITH, EDWARDS, and SOURIS, JJ.

BLACK, J., dissenting.

Appeal from Michigan Civil Service Commission. Submitted January 3, 1961. (Docket No. 8, Calendar No. 48,584.) Decided September 21, 1961.

Lottie E. Dillon, upon her discharge as an employee of the Lapeer State Home and Training School, requested hearing before the Michigan Civil Service Commission. Decision of commission entered to the effect separation was justified because of conduct unbecoming a State employee. Plaintiff appeals. Reversed, with direction of reinstatement and payment of accrued wages.

---

* Continued from Volume 363.

REFERENCES FOR POINTS IN HEADNOTES

10 Am Jur, Civil Service § 11; 43 Am Jur, Public Officers § 181 *et seq.*

*Anderson, Carr & Street* (*Cassius E. Street, Jr.,* of counsel), for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Leon S. Cohan* and *Harry Iwasko, Jr.,* Assistant Attorneys General, for defendant Lapeer State Home and Training School.

*Archie C. Fraser* (*Fraser, Trebilcock, Davis & Foster,* and *Ronald R. Pentecost,* of counsel), for defendant Michigan Civil Service Commission.

KAVANAGH, J. Plaintiff appeals from a decision and order of the Michigan civil service commission dated September 21, 1959, affirming her dismissal or separation from employment in State civil service at the Lapeer State Home and Training School.

Plaintiff was suspended on October 9, 1958, from her employment as an attendant nurse A2, pending an investigation by the Lapeer county sheriff's department on the charge of theft of State property. On October 31, 1958, while the official investigation was still pending, plaintiff was permanently dismissed. The report of separation to the civil service commission simply stated the following: "Mrs. Dillon dismissed for conduct unbecoming a State employee."

The decision of the civil service commission on September 21, 1959, from which plaintiff appeals, is as follows:

"The commission discussed the appeal of Lottie E. Dillon, former employee of the Lapeer State Home and Training School, after accepting and carefully considering the transcript of testimony taken before the hearing board on July 16, 1959, together with the exhibits, written interrogatories, and briefs of Mr. Cassius E. Street, Jr., attorney for Mrs.

Dillon, and Mr. Harry Iwasko, Jr., assistant attorney general representing the Lapeer State Home.

"On motion duly made and supported the commission unanimously affirmed the suspension for investigation and the subsequent dismissal of Lottie E. Dillon by the Lapeer State Home because of conduct unbecoming a State employee.

"The commission determined that the transcript of testimony at the hearing *de novo* of July 16, 1959, the exhibits introduced, and the interrogatories submitted do fully support a finding of conduct by Mrs. Dillon which is unbecoming a State employee and which justifies the separation of Mrs. Dillon from employment in the State civil service at the Lapeer State Home."

The following facts are pertinent to an understanding of the matter: Upon her dismissal October 31, 1958, plaintiff appealed to the civil service commission hearing board. Prior to a hearing by the board on December 2, 1958, no further notice as to the specific reasons for her dismissal was given plaintiff, nor was she given any specific information as to the particular acts of misconduct charged against her. Plaintiff appeared at the hearing and complained of the lack of proper notice and for the first time learned some of the alleged acts of wrong-doing when certain witnesses appeared at the hearing and gave testimony against her.

Dr. Rehn, superintendent of Lapeer State Home and Training School, stated that plaintiff's dismissal was based on the charge that she and her husband removed "articles from the unit in which she was employed and placed them in their automobile, then Mr. Dillon would pick her up with the articles that did not belong to her." Plaintiff's husband, Elmer A. Dillon, had also been dismissed from his employment at the Lapeer State Home and Training School for alleged complicity with his wife. His case was

also heard by the board on December 2, 1958. The hearing board canceled the suspension and dismissal of Elmer A. Dillon and reinstated him effective as of the temporary suspension date of October 9, 1958.

A subsequent hearing was had on plaintiff's case before the Michigan civil service commission. The commission affirmed the hearing board's decision, approving plaintiff's dismissal without giving any specific findings as to the reason. On March 20, 1959, plaintiff filed an application for leave to appeal to this Court from the commission's decision. While this application was pending it was stipulated between the parties that the application was to be withdrawn without prejudice and with the right to re-apply, and the plaintiff would be permitted a rehearing *de novo*. Such a hearing was ordered before the civil service commission on June 17, 1959. The Lapeer State Home and Training School was directed by the commission to prepare and serve upon plaintiff, in advance of that date, an amended notice of separation setting forth for the first time the specific reasons for plaintiff's removal. A supplemental report of separation dated May 29, 1959, and delivered to plaintiff shortly thereafter, read as follows:

"The report of separation, dated October 31, 1958, in regard to your dismissal from State service is supplemented as follows:

"You have been discharged for conduct unbecoming a State employee in that:

"1. You have taken and converted to your own use State and personal patient property from the Lapeer State Home and Training School. This property was taken over a period extending from on or about March 20, 1948, to on or about October 29, 1958, and included, among other items:

"(a) A number of patient's cotton dresses and coats;

"(b) A number of institutional towels and bed linens;

"(c) Institutional kitchen ware;

"(d) Institutional cleaning supplies;

"(e) Miscellaneous food stuff;

"(f) Personal patient belongings.

"2. You have utilized State facilities for personal purposes contrary to specific orders in that you have used State laundry facilities and supplies for laundering your own and your family's clothing."

Plaintiff complains the new notice is inadequate since it covers the full period of 10 years she has worked for the State, supplies no dates, no specific items of property, no names, no locations, and in short no specific acts of dishonesty or theft or other facts which would fairly apprise her of the full, specific reasons for her dismissal. The amended notice, also for the first time, contained a charge that plaintiff had violated local school orders or regulations by having her personal laundry done in State facilities.

After commencing the hearing on June 17, 1959, the commission concluded it was not equipped nor prepared to hear the case *de novo* and ordered the parties to appear before a hearing board at Lapeer State Home and Training School on July 16, 1959, for a full scale *de novo* hearing. The hearing board was to conduct the hearing, prepare a transcript, and forward it to the commission without decision, recommendation, or comment, for a review and determination by the commission. A hearing was held at the school on July 16, 1959. The transcript was thereafter prepared and forwarded to the civil service commission. On September 21, 1959, the civil service commission met and concluded that plaintiff's dismissal was proper and justified by the record before it.

Plaintiff sought leave to appeal to this Court and, leave having been granted, she now asks this Court for reinstatement to her position as a civil service employee retroactive to October 9, 1958, together with restoration of pay for the entire period of her suspension and dismissal.

Plaintiff entered the employ of the State on March 20, 1948. Her civil service record reflects that she has consistently been given the highest rating attainable throughout her tenure. There has never been any previous question concerning her capabilities or honesty. Her employee promotional potential report and rating dated February 17, 1958, under "personality attributes" shows the following: "Emotionally stable; has ability to adjust to changes, honest; appears free from strong personal prejudices; shows self control." This report was signed by Robert J. Dave, reporting supervisor, and Alice L. Pearson, attendant nurse supervisor. It is to be noted that the employee promotional potential report of February 17, 1958, contained the recommendation of 'the departmental rating committee that Mrs. Dillon was promotable. This report was signed by Helen B. Linehan, director of nursing service, L. Waterbury, personnel officer, and A. T. Rehn, M.D., superintendent.

On appeal plaintiff raises 4 questions, only 1 of which need be discussed herein, since it will be dispositive of this appeal. The question is:

Is there any competent, material, and substantial credible evidence in the record, on which the dismissal action must be based, to sustain the decision and order of the civil service commission?

The role of an appellate court in reviewing the decisions of administrative agencies has been adequately defined in the decisions of many courts. The United States supreme court, in the case of

*Consolidated Edison Co.* v. *National Labor Relations Board,* 305 US 197, 229, 230 (59 S Ct 206, 83 L ed 126), said:

"We agree that the statute, in providing that 'the findings of the board as to the facts, if supported by evidence, shall be conclusive,' means supported by substantial evidence. *Washington, V. & M. Coach Co.* v. *National Labor Relations Board,* 301 US 142, 147 (57 S Ct 648, 81 L ed 965). Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Appalachian Electric Power Co.* v. *National Labor Relations Board* (CCA 4), 93 F2d 985, 989; *National Labor Relations Board* v. *Thompson Products* (CCA 6), 97 F2d 13, 15; *Ballston-Stillwater Co.* v. *National Labor Relations Board* (CCA 2), 98 F2d 758, 760. We do not think that the court of appeals intended to apply a different test. In saying that the record was not 'wholly barren of evidence' to sustain the finding of discrimination, we think that the court referred to substantial evidence. *Ballston-Stillwater Co.* v. *National Labor Relations Board, supra.*

"The companies urge that the board received 'remote hearsay' and 'mere rumor.' The statute provides that 'the rules of evidence prevailing in courts of law and equity shall not be controlling.' The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. *Interstate Commerce Comm'n* v. *Baird,* 194 US 25, 44 (24 S Ct 563, 48 L ed 860); *Interstate Commerce Comm'n* v. *Louisville & Nashville R. Co.,* 227 US 88, 93 (33 S Ct 185, 57 L ed 431); *United States* v. *Abilene & Southern R. Co.,* 265 US 274, 288 (44 S Ct 565, 68 L ed 1016); *Tagg Bros. & Moorhead* v. *United States,* 280 US 420, 442 (50 S Ct 220, 74 L ed 524). But this assurance of a desirable

flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence."

42 Am Jur, Public Administrative Law, § 132, p 467, sets forth the rule as follows:

"It is essential that there be some evidence to support an administrative determination which is required to be made upon a hearing. A basis in surmise or conjecture or a mere scintilla of evidence is not sufficient. * * *

"The comparative degree of proof by which a case must be established is the same in an administrative as in a judicial proceeding—that is, a preponderance of the evidence. It is not satisfied by proof creating an equipoise, but it does not require proof beyond a reasonable doubt. No essential issue may be left to surmise, guess, or conjecture, for an administrative body cannot base an award or decision upon conjecture or speculation, although a determination may properly be based on circumstantial evidence. * * *

"While administrative tribunals may receive and consider evidence which would not be competent in court proceedings, yet their decisions cannot be wholly based on such evidence, but must have a basis in some competent legal evidence."

The decisions of this Court disclose the function of an appellate court on review of a civil service commission determination is "to consider whether or not there is substantial evidence to support the finding of the commission." *O'Dell* v. *Civil Service Commission of Flint,* 328 Mich 631; *Public Welfare Commission of Detroit* v. *Civil Service Commission of Detroit,* 289 Mich 101.

In *Public Welfare Commission of Detroit* v. *Civil Service Commission of Detroit, supra,* this Court, speaking through Justice BUSHNELL, said (p 108):

"We are only concerned, however, with the determination of whether or not there was substantial evidence to support the finding of the commission."

We now turn to the particular charges and a review of the testimony in order to determine whether there is competent, material, and substantial evidence existing in the record to support the charges. In order to do so we shall review the testimony with reference to the first charge—that of taking and converting to her own use State and personal patient property from the Lapeer State Home and Training School over a period extending from March 20, 1948, to on or about October 29, 1958. Although it is apparent that many of the specific allegations of this general charge have been abandoned by the civil service commission and statements to this effect were made at the time of oral arguments, we deem it advisable to mention each of them.

The first mention of missing property is found in the testimony of Dr. A. T. Rehn, the medical superintendent of the Lapeer State Home and Training School. He mentions 13 missing bedspreads; however, he readily admits he was not claiming that Mrs. Dillon took them and had no proof to connect her with them. These were never again mentioned in the record or in the arguments and briefs. Clearly, no evidence supports any theft of these items by appellant.

Next, Mrs. Pearson, one of Mrs. Dillon's superiors, who recommended her for promotion on February 17, 1958, and who certified she was an honest person, testified concerning certain missing items—a nice private coat, some dresses, an electric iron, some yarn and a traveling bag. The record discloses the traveling bag was never again mentioned. No testimony is in the record connecting Mrs. Dillon in any way with the electric iron or traveling bag. As

to the yarn, Mrs. Pearson testified she discovered several boxes missing when she returned from a vacation. Mrs. Pearson was unable to say who had had access to the yarn in her absence. No testimony was introduced to connect Mrs. Dillon with the disappearance of the yarn.

The record discloses, according to the testimony of Mrs. Pearson, that a coat was missing. The inference would appear to be that since she and Mrs. Dillon, according to Mrs. Pearson's testimony, were the only ones who had keys to the storeroom where the coat was kept, and that since she didn't take the coat, Mrs. Dillon did.

Mrs. Julia Hale, an employee of the Lapeer State Home and Training School, testified for the State, and on cross-examination answered as follows:

"*Q.* Is it not true that you took a patient's coat a private personal coat belonging to one of the patients from cottage 23?

"*A.* That is not true."

On re-direct examination by Mr. Cohan, attorney, the following question was asked of Mrs. Hale:

"*Q.* Mrs. Hale would you care to explain to the board any situation you did obtain a coat?

"*A.* I will. One of the patients who hadn't been there too long and the parents were quite well off and they came in and they were going south for the winter and one of the daughters I believe is a school teacher or social worker or what not, and they had this beautiful array of women's clothing with a stipulation of a desire by both the mother and father that if there was anything there that an attendant could use that to please request that they could use it and I am very humble and proud to say I wore a coat for 2 years. I didn't steal it, Mrs. Pearson gave it to me and I put it over my arm and walked out with it but I did not steal it. There wasn't a

person in the building that didn't know where that coat came from."

It is to be noted that at least this coat was given to Mrs. Hale by Mrs. Pearson herself.

The only other articles mentioned by Mrs. Pearson as missing were some dresses. The record does not disclose how many dresses were missing, and other than the fact that some dresses were missing, and Mrs. Dillon was an employee at the time, there is nothing to tie their disappearance to Mrs. Dillon.

The following examination was made of Mrs. Pearson relative to the dresses:

"*Q.* What about the dresses you referred to as being State property. What kind of dresses were those, Mrs. Pearson?

"*A.* They are cotton dresses. There were 16 dresses that came in and—

"*Q.* Were they the kind you can buy in a store?

"*A.* Well at the time they were boughten dresses, nice cotton dresses.

"*Q.* Prints and that sort of thing?

"*A.* Yes.

"*Q.* And they were put into this special supply room and you kept an inventory on those?

"*A.* Yes, I did.

"*Q.* Did you check them out or something when they went out so you could keep a tally?

"*A.* They came in on my day off and Mrs. Beardsley took them upstairs and she said Mrs. Pearson here are 16 nice Sunday dresses and we counted them Saturday night at 4:30 I went upstairs and counted them again. There was 16 dresses. Sunday morning about 8:30 I went upstairs to pass the soap out then there were 16 dresses.

"*Q.* During this period of time now, you didn't see Mrs. Dillon take the dresses did you?

"*A.* I didn't see nobody take the dresses.

"*Q.* And when you say upstairs you are referring to the upstairs supply room?

"*A.* That's right.

"*Q.* Did you conduct an investigation to show or rather to see whether or not these dresses had been assigned out to any of the patients?

"*A.* There had been none of the dresses signed out.

"*Q.* Did you investigate that? Are you the only one to pass the dresses out?

"*A.* Either Mrs. Dillon or I.

"*Q.* Either Mrs. Dillon or yourself?

"*A.* Yes, but she didn't have to pass them out Saturday night because she didn't have time.

"*Q.* When did they come in?

"*A.* They came in on a Friday.

"*Q.* While you were not there?

"*A.* Yes.

"*Q.* And you found them missing on Sunday?

"*A.* Yes."

It is admitted that Mrs. Beardsley had Mrs. Pearson's keys on her days off and that she had the same access to these articles as did Mrs. Pearson and Mrs. Dillon. Mrs. Dillon denied under oath taking the dresses and there is no evidence indicating how many were missing or whether they were distributed to the children or actually were taken by someone.

On the subject of whether or not other people may have had keys at one time or another, Mrs. Pearson was asked these questions on cross-examination and gave these answers:

"*Q.* And sometimes trusted patients and brighter girls were allowed to have these keys were they not to help the employees get linen out and so on?

"*A.* I don't know about what the other folks were doing.

"*Q.* But you never saw that done in your presence or allowed that to be done?

"*A.* Well sometimes you had to do it when you didn't have too much help.

"*Q.* Sure, sometime you had to do it and it was done often in your presence wasn't it?

"*A.* Well—

"*Q.* Do you not want to answer the question?

"*A.* I answered it.

"*Q.* What was your answer I am sorry I didn't hear it?

"*A.* We had to do things like that if we didn't have the help on."

It is to be emphasized that Mrs. Pearson during the entire 15 pages of her testimony, and with reference to the several articles she indicated as missing, fixed no dates or times and on several occasions indicated she could not fix a date.

Following the testimony by Mrs. Pearson, a Mrs. Stratton, another employee at the training institution, testified. As to the alleged theft by Mrs. Dillon of pillowcases or items contained therein, the following discussion occurred:

"*Q.* Now during the time that you worked with and for Mrs. Dillon, did you ever see her take any property out of cottage 23?

"*A.* One night the first night that I noticed her she got into my car with a pillow case.

"*Q.* She got into your car with a pillow case?

"*A.* She came out of the building with something in a pillow case and got in my car with it.

"*Q.* Did you see her do this?

"*A.* Yes I did.

"*Q.* About what time of the day was this?

"*A.* This was about a quarter after 9 at night.

"*Q.* Had you given her authority to go into your car for any purpose?

"*A.* No.

"*Q.* How did she get into your car?

"*A.* It was unlocked. She just opened the door and got in.

"*Q*. Did you say anything to her about this?

"*A*. No I didn't.

"*Q*. Why not?

"*A*. Well, I just decided I would keep my car locked.

"*Q*. Did you see her take these items out of your car?

"*A*. Yes I did.

"*Q*. What did she do?

"*A*. She got out of my car and got into Mr. Dillon's car when he came to pick her up.

"*Q*. Her husband?

"*A*. Yes.

"*Q*. Did this ever happen again?

"*A*. Yes one night it was either the 2d or 3d of July.

"*Q*. Of what year?

"*A*. 1958 and I went in I was in a hurry that night and at the time I kept my car locked and this night I forgot it.

"*Q*. And did you see her taking something out of the car, I mean the cottage?

"*A*. As soon as she went out a little earlier than usual I heard a door down below slam. It came to me that I left my car unlocked and that is the first I thought of it.

"*Q*. Did you look and see what was happening?

"*A*. Yes I did.

"*Q*. What did you see?

"*A*. She got into the car as before.

"*Q*. Was she carrying anything?

"*A*. Yes, a pillow case.

"*Q*. What was it, an empty pillow case?

"*A*. No it was—it had something in it.

"*Q*. Do you know what was in it?

"*A*. No I do not know."

Mrs. Stratton was asked on cross-examination:

"*Q*. You have no idea what was in the pillow case do you?

"*A*. No I don't.

"*Q.* And you don't know whether or not they belonged to Mrs. Dillon do you?

"*A.* I don't know."

Mrs. Dillon testified she never took any pillow cases from the school belonging to the State Home and Training School. She was asked the following questions and gave the following answers:

"*Q.* Did you ever take bundles of uniforms tied up out to your car?

"*A.* Yes, lots of times.

"*Q.* That would be for what purpose?

"*A.* For Mrs. Curran to wash. I tied them up so I wouldn't lose them."

Mrs. Stratton also testified she had seen Mrs. Dillon take 2 boxes of Ivory soap out of the building and put them in her car. Again on cross-examination she was asked:

"*Q.* And the boxes of Ivory soap they were the kind you can buy in a commercial store? Were they soap boxes or what were they?

"*A.* They were Ivory soap. I don't know if they were in boxes or what.

"*Q.* And there is a community store and you can buy things like that at the store, can't you, and people did it often?

"*A.* That's right."

Mrs. Stratton was also asked the following question and answered as follows:

"*Mr. Street:* The cleaning supplies that you received at your bailiwick, at cottage 23 didn't normally come in boxes of Ivory Snow did they?

"*Mrs. Stratton:* No."

Such testimony should not be relied upon to support an allegation of taking State property.

The other articles to which reference was made were 3 hot dogs, 3 slices of bread, and some curtain

rods. The alleged testimony with reference to these items is by Ann Hutchins, an employee of the institution, who worked with Mrs. Dillon. She testified on direct examination:

"*Q.* Did you ever see Mrs. Dillon take any State property out of the building?

"*A.* Yes, I have.

"*Q.* What was it and approximately when did you see it?

"*A.* It was hot dogs, bread, and curtain rods.

"*Q.* What year was that?

"*A.* Well probably the year would be about 1958 or 1957 I don't recall.

"*Q.* Where were you when you saw that?

"*A.* Out in the office.

"*Q.* Describe what you saw.

"*A.* Well I was in the office and it was almost lunch time and I was getting ready to go out to lunch. In fact I was waiting for my ride and Mrs. Dillon came in with these 3 hot dogs and 3 slices of bread and they were in wax paper that the loaves of bread were wrapped in the dining room and she said she was going to take these hot dogs for lunch out to her mother-in-law. And the curtain rods it was about the same time of day she was waiting for her ride and so was I and a girl from another cottage brought these curtain rods in and said they belonged to—

"*Mr. Street:* I'll object to what a girl from another cottage said.

"*Q.* What happened to the curtain rods?

"*A.* Mrs. Dillon took them out to her car.

"*Q.* Were they State property?

"*A.* Yes.

"*Q.* Personal property? Personal patient property?

"*A.* Yes."

Later Mrs. Hutchins was asked the following questions and gave the following answers:

"*Q.* Did you see Mrs. Dillon take anything else out of the building besides hot dogs and curtain rods?

"*A.* Not that I can recall.

"*Q.* Did you report this to your supervisor at the time or at any time?

"*A.* No."

On cross-examination Mrs. Hutchins testified as follows:

"*Q.* Did you see Mrs. Dillon take these 3 slices of bread and 3 hot dogs out of the patients' dining room?

"*A.* No.

"*Q.* You didn't see where they came from did you?

"*A.* No.

"*Q.* And she had them right out in the open in your presence and said she was going to where?

"*A.* Going to take them out to her mother-in-law for lunch.

"*Q.* She didn't say that she had stolen them or taken them from the patients' dining room did she?

"*A.* No.

"*Q.* You just concluded that?

"*A.* That is the only dining room there is.

"*Q.* There was one 3 blocks away where you can buy things, right?

"*A.* How could she get things there when she was not there on her lunch time.

"*Q.* But you don't know. You didn't see where she brought the hot dogs and bread from did you?

"*A.* No.

"*Q.* As to these curtain rods, you said that they were personal patient or private personal patient property or something of that nature?

"*A.* Yes."

Mrs. Hutchins' testimony with reference to the curtain rods was explained by Mrs. Dillon, who testified they were given to her by a patient's father, Wesley Woods. The affidavit of Wesley Woods

was read into evidence upon stipulation. In the affidavit Mr. Woods stated his daughter, Sharon Woods, then being a patient at Lapeer State Home and Training School, was moved from cottage No. 30 to cottage No. 23 and that he had previously bought his daughter some curtains and curtain rods which she used when she was living in a separate room in cottage No. 30. He stated that upon moving from cottage 30 to cottage 23, he took the curtains and curtain rods to cottage 23 and found his daughter would not be occupying a separate room where she would have need for the curtain rods. He stated he told Mrs. Dillon he would take the curtains himself, since there was no need for them, but that she should take the curtain rods, which he then gave her to dispose of as she saw fit.

Certainly, nothing in the testimony of Ann Hutchins with reference to the hot dogs, bread, and curtain rods rises to the dignity of competent, substantial evidence upon which to base Mrs. Dillon's discharge.

Four towels were also introduced in evidence. No proof that Mrs. Dillon had stolen them was offered. The towels were found at the home of Mrs. Dillon's brother-in-law. The brother-in-law and his wife testified that their home had burned and they had lost all their property, and that the community donated a large amount of furniture and furnishings for them to re-establish housekeeping. The towels were given to them by someone at that time, and they had no way of knowing who had contributed them. The Lapeer State Home and Training School had 1,056 employees, many of whom gave various household articles to the brother-in-law and his wife. The brother-in-law and his wife specifically denied receiving any State towels from appellant.

The final 2 items of personal property referred

to in the record are a pound of State butter, in a coffee can, and some grapefruit sections.

The sole testimony with reference to the butter was on direct examination of Mrs. Hale, as follows:

"*Q.* Now Mrs. Hale was there a time during the time that you worked at the cottage with Mrs. Dillon that she called you concerning anything on the telephone?

"*A.* This time that you are referring to she did call me about 5:30 in the evening and asked me if there was a coffee can sitting in the office and I said yes there was and she said please send it up to Mary Ellen's room.  Mary Ellen was a brighter patient and she had a room of her own and I did just that and thought no more of it until the next day.  She came in at 1 and she said I was very glad to hear that you answered the phone, there was a pound of State butter in that coffee can.

"*Q.* Did you know that there was a pound in the coffee can when you took it up?

"*A.* I did not.  I was busy when I took it up there and I did what she told me and I would never have noticed that it had been there had she not told me."

No representation was made or could possibly be inferred that Mrs. Dillon took or removed the pound of butter for her own use.

Other testimony of Mrs. Julia Hale had to do with the last item of personal property—the grapefruit sections.  The entire testimony with reference to this item is as follows:

"*Q.* Had there been incidents before this that you did not report?

"*A.* Yes there was.

"*Q.* What were they?

"*A.* Well this one day I noticed a brighter girl washing out a large glass can a screw type with a real wide mouth, which I thought was unusual to see a girl doing that and I suppose it was my curi-

osity. Later I observed that she was in the coffee room placing grapefruit sections from a large State can in the glass jar and by that time I was curious. It was such an odd thing to see and later I saw the same girl taking it out to the Dillon car and leaving it there.

"*Q*. When you speak of a girl that is a patient?
"*A*. Yes."

No testimony is given connecting this incident with Mrs. Dillon in any way. It is not indicated that Mrs. Dillon was present; that she directed the girl to do this; or that she knew anything about it.

The only remaining item has to do with the violation of a rule forbidding the washing of personal clothes at the school. All admit that employees did violate this alleged rule for many years and until a very short time prior to the dismissal of Mrs. Dillon. It is admitted that all employees paid one of the brighter girls, who had a washing machine furnished by her parents, to do their laundry. This girl was paid through Mrs. Pearson and the money went over to the main office for the girl. Even if such rule did, in fact, exist, it seems clear it was never properly enforced. Assuming appellant was guilty of this charge, it is admitted by appellee that the established practice at the institution was merely to warn employees for any violation of this rule and not to dismiss them.

It is on this record we are asked to conclude that the State civil service commission's decision and order should be upheld. We have detailed considerable testimony far beyond the normal handling of a case. By so doing, we show the complete lack of proof of the allegations. We can but conclude that the record obviously does not contain substantial, material and competent evidence of wrongdoing on the part of appellant. The most that could be said is that the record contains suspicions, insinua-

tions, and unsubstantiated accusations. Any dismissal order based upon this record would offend not only the concepts of fair play, but shock the conscience of anyone who would take the time to read the record on which the order was based.

The decision and order of the State civil service commission is vacated, and it is directed that plaintiff be reinstated and returned to employment at the Lapeer State Home and Training School, and that she be paid all wages withheld as a result of these proceedings.  Plaintiff shall have costs.

DETHMERS, C. J., and KELLY, J., concurred with KAVANAGH, J.

EDWARDS, J. (*concurring in reversal*).  We deal herein with the appeal of a State employee who was discharged from her employment at the Lapeer State Home and Training School.  The discharge was subsequently twice affirmed by the State civil service commission.

The previously existing untrammeled right of the State of Michigan and its executive branches to hire and discharge State employees was qualified in 1940 by the civil service amendment to the Constitution (1908), art 6, § 22.  The provisions of this amendment which are applicable to our present case follow:

"The commission shall classify all positions in the State civil service according to their respective duties and responsibilities, fix rates of compensation for all classes of positions, approve or disapprove disbursements for all personal services, determine by competitive performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the State civil service, make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the State civil service.  No person shall be

appointed to or promoted in the State civil service who has not been certified as so qualified for such appointment or promotion by the commission. No removals from or demotions in the State civil service shall be made for partisan, racial, or religious considerations. * * *

"After August 1, 1941, no payment for personal services shall be made or authorized until the provisions of this amendment have been complied with in every particular. Violation of any of the provisions hereof may be restrained or observance compelled by injunctive or mandamus proceedings brought by any citizen of the State."

Following adoption of the constitutional amendment, the civil service commission adopted rules of procedure as authorized. One of these rules which was in effect at the time of the discharge with which we deal in this field was Rule 38, entitled "Removal":

"Any employee in the State civil service failing to carry out the duties and obligations imposed upon him by these rules, or whose conduct is unbecoming that of a State employee, or whose service rating is unsatisfactory, shall be subject to removal by the appointing authority upon notification to the State personnel director, except that the commission alone shall have the power to remove the State personnel director.

"A. *Procedure for removal.*—Whenever an appointing authority considers it necessary to remove an employee he shall notify the employee on the prescribed form, giving specific reasons for the removal. Prior or concurrent notice of such removal shall be given to the State personnel director in the prescribed manner."

On the form CS-301 Rev 1057, entitled "Report of Separation," which was served upon appellant Dillon in this case, following the printed words "Reason for Separation. Fairly apprise employee of full

specific reason," was the following in typewritten form:

"Mrs. Dillon dismissed for conduct unbecoming a State employee."

In our view, nothing could be more obvious than that the report of separation complained of did not comply with the regulations of the civil service commission. The Constitution vested in the commission the power to "make rules and regulations covering all personnel transactions, and regulate all conditions of employment in the State civil service." It seems clear that such a broad grant authorized the rule we have quoted which required an appointing authority in removing an employee to notify the employee, "giving specific reasons for the removal." The general phrase quoted from the rule pertaining to removal, "conduct  *  *  *  unbecoming that of a State employee," is anything but a specific reason. It is, in fact, a conclusion which must be based upon some specific dereliction.

Kaplan, The Law of Civil Service, pp 225, 228, discusses the requirement of notice:

"Where the statute requires that the notice merely set forth in general terms the reasons for the discharge, no specific detailed charges need be furnished. A general statement of reasons, assuming the reasons are on their face such as to give the employee what would be recognized as reasonably plausible grounds, is all that is necessary. A general statement so obscure as 'neglect of duty,' 'political activity' or similar generalities would be insufficient."

Obviously, a generality such as our instant "conduct unbecoming a State employee" would be insufficient if only a general statement of reasons were required. It is meaningless in the face of our Rule 38 requiring "specific reasons."

The United States supreme court has held that where an authority's discretion to remove employees is unbridled by law, the authority is nonetheless bound to follow the procedures it establishes for the removal of employees for security reasons. *Service* v. *Dulles,* 354 US 363 (77 S Ct 1152, 1 L ed 2d 1403); *Vitarelli* v. *Seaton,* 359 US 535 (79 S Ct 968, 3 L ed 2d 1012).

The same reasoning would be applicable to our case. With the exception of the prohibition of removal for partisan, racial, or religious considerations, article 6, § 22, of our Constitution leaves the commission unhampered as to reasons or procedures for removal. However, our commission has adopted a set of rules which sets forth the procedure to be followed. It seems beyond doubt to us that Mrs. Dillon's original discharge was not carried out under the mandate of Rule 38 and hence was invalid.

Having said so, however, this by no means disposes of the present appeal. For, subsequent to Mrs. Dillon's filing an application for leave to appeal to this Court from the civil service commission's action upholding her original discharge, a rehearing was granted by the commission and the application for leave to appeal was withdrawn without prejudice—presumably to correct the deficiency in the original discharge procedure.

Prior to the rehearing, a supplemental report of separation was served upon Mrs. Dillon which we quote in full:

"May 29, 1959

"Mrs. Lottie Dillon
2496 Imlay City Road
Lapeer, Michigan
"*Dear Mrs. Dillon:*

"The report of separation, dated October 31, 1958, in regard to your dismissal from State service is supplemented as follows:

"You have been discharged for conduct unbecoming a State employee in that:

"1. You have taken and converted to your own use State and personal patient property from the Lapeer State Home and Training School. This property was taken over a period extending from on or about March 20, 1948, to on or about October 29, 1958, and included, among other items:

"(a) A number of patient's cotton dresses and coats;

"(b) A number of institutional towels and bed linens;

"(c) Institutional kitchen ware;

"(d) Institutional cleaning supplies;

"(e) Miscellaneous food stuff;

"(f) Personal patient belongings.

"2. You have utilized State facilities for personal purposes contrary to specific orders in that you have used State laundry facilities and supplies for laundering your own and your family's clothing.

"Very truly yours,
"A. T. REHN, M.D.
"Superintendent

"LLW/s
  cc: Mr. Arthur G. Rasch
  cc: Mr. Kenneth Smith
  cc: Mr. Cassius E. Street, Jr.
  cc: Mr. Leon S. Cohan"

It is to be noted that, under item 1, Mrs. Dillon is charged in this letter with theft of an undetermined number of institutional items of a very general nature. Whatever "miscellaneous food stuff" or "institutional cleaning supplies" lacks in specificity, the dates of the alleged thefts as set forth in this letter are even more deficient. "A period extending from on or about March 20, 1948, to on or about October 29, 1958," covers more than 10 years. This is perhaps a quarter of the working life of an average individual.

Theft from the State is not an attitude or a condition. It is either an event or a series of events which happen at specific times and places in relation to specific items. The civil service commission has seen fit to require that specific reasons be given for discharge. We must presume the reason for this provision is to extend to the employee the opportunity to know the nature of the complaint in order for him to muster adequate proofs of innocence, if any there be. Beyond observing that the Constitution plainly contemplates placing both rule-making power and fact-finding power concerning alleged violations of those rules in the hands of the civil service commission, and that the test of employee honesty is not the value of the article alleged to have been taken, we do not pass upon the fact questions presented by this record. The discharge must be held invalid for failure on the part of the administrative agency to conform in its May 29, 1959, supplement to the same rule requiring specificity which we have previously held to have invalidated the original report of separation.

In a case involving somewhat similar problems pertaining to Federal employees, Justice Frankfurter said:

"An executive agency must be rigorously held to the standards by which it professes its action to be judged. See *Securities & Exchange Comm'n* v. *Chenery Corp.*, 318 US 80, 87, 88 (63 S Ct 454, 87 L ed 626). Accordingly, if dismissal from employment is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed. See *Service* v. *Dulles*, 354 US 363. This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly so." *Vitarelli* v. *Seaton, supra,* pp 546, 547.

Reversed.   No costs, public questions being involved.

TALBOT SMITH and SOURIS, JJ., concurred with EDWARDS, J.

BLACK, J. (*dissenting*).   Our order granting leave to review plaintiff's dismissal was necessarily based on the limited showing Court Rule No 60 (1945)* affords.   Now that this exhaustive record of sharply contested hearings and rehearings, before the tribunals set up under the civil service amendment of 1940 (Const [1908], art 6, § 22), has been brought in for contemplative test against plaintiff's allegations of reversible error, I can only conclude that the appointing authority has made such showing of fact and inference from fact as legally warrants the civil service commission's order dismissing this State employee.

The attorney general has accurately summarized the case brought here:

"The civil service commission, as a constitutionally created body, is given the authority to regulate all conditions of employment in the State civil service.   One of its duties is to review appeals presented to it by employees discharged by their appointing authorities.   While it is essential that the discharged employee understand the reasons for the action of the employer, it is not essential that where such understanding exists independently that additional written specifics be supplied such employee.   Irrespective of this, however, the appellant in the instant case has been supplied by 3 hearings preceding the final hearing *de novo* with more than adequate notice of all specifications and was in fact able to defend against each and every charge of her employer.

"Of necessity, much of the proof adduced in these matters is circumstantial because of the nature of

---

* For amendment, see 347 Mich xvi.—REPORTER.

the action involved. Just as the appellant was al-leged to have stated, it takes 2 people to really prove a mishandling of State property for the reason that misappropriation of an employer's property is com-mitted with ingenious care and secrecy. However, inferences can reasonably be drawn from the testi-mony of many individual employees who have no personal reason to testify against the appellant. Furthermore, the very reason that they are testify-ing against the appellant raises an inference of credibility in and of itself due to the obvious distaste of such a task. It has been the rule of law in admin-istrative proceedings that a consideration of circum-stantial evidence is proper, especially when it is coupled with some competent evidence. There was sufficient competent evidence adduced to sustain the dismissal from State service of the appellant."

I adopt the quoted summary and hold that, there being some if not abundant proof tending to justify the commission's decision, the judicial process has no further function. See separate opinion, *Lyons* v. *Employment Security Commission*, 363 Mich 201, 228.

I vote to affirm.

Carr, J., did not sit.