382 S.E.2d 51

**William H. LEWIS**

**v.**

**Cathy GATSON, Clerk; the Board of Review of the West Virginia Department of Employment Security; and Southern Ohio Coal Company.**

**No. 18704.**

Supreme Court of Appeals
of West Virginia.

June 8, 1989.

Robert M. Steptoe, Jr., and Richard M. Yurko, Jr., Steptoe & Johnson, Clarksburg, for Cathy Gatson.

Jack O. Freidman, Dept. of Employment Sec., Charleston, for Southern Ohio Coal Co.

Allan Karlin, Morgantown, for William H. Lewis.

Miller, Justice:

In this unemployment compensation appeal, the employer, Southern Ohio Coal Company (SOCCO), contends that the Circuit Court of Kanawha County was clearly wrong in overturning a decision of the Board of Review (Board) of the West Virginia Department of Employment Security. The Board had reversed the decision of the Administrative Law Judge (ALJ) who had heard the evidence and had found Mr. Lewis eligible for benefits because he had terminated his employment for valid health reasons. The circuit court held that the Board was "plainly wrong" in its reevaluation of the facts. We agree.

The record developed before the ALJ was that William Lewis had been employed by SOCCO as a preparation plant supervisor since 1976. He had tendered his resignation on June 4, 1986, to be effective two weeks later. Mr. Lewis maintained that he left SOCCO's employment for health reasons. In support of that contention, he offered testimony that his job stress had created mental stress and depression which eventually caused his resignation. His witnesses included Paul Zanussi, SOCCO personnel representative, who met with him on the day he resigned. Mr. Zanussi testified that Mr. Lewis resigned in part for health reasons.[1] Mr. Lewis's written resignation

---

1. Mr. Zanussi testified during the September 9, 1986 administrative hearing, as follows:

"Q: Did he tell you that he was resigning for reasons of personal health?

form, which he signed, contained the comment "I don't feel that I am any longer making progress, and with the increase in work, and responsibility my nerves are causing me to feel I don't want to work here any longer." Mr. Zanussi completed an "Exit Interview Form," which gave the reasons for termination: "Bill states he is unhappy with his job and feels it is upsetting his nerves and affecting his health. He feels he cannot maintain and accept the responsibility of the job." Mr. Zanussi further commented on the form: "William has had personal problems in the past. R. Haught stated he has seen a change in William's attitude over the last few weeks." Mr. Lewis did not submit a physician's report to SOCCO or to the West Virginia Department of Employment Security.

Mr. Lewis had a history of problems with stress while employed by SOCCO. Mr. Zanussi and Richard Haught, SOCCO preparation superintendent and Mr. Lewis's supervisor, testified that they knew about Mr. Lewis's history of mental stress. Mr. Lewis testified that in 1980, a nervous breakdown required hospitalization for a period of one month. In 1983, he was again off work due to his nerves. He attempted to be admitted to a Veterans Administration Hospital, but the day before he was finally to be admitted, SOCCO called him back to work. He described his feelings in June, 1986: "Well, I just felt inside like I was going back to the way I felt before in 1980 when I went to the hospital and it scared me."[2] He stated that he was being treated by a doctor for his stress and depression for which he was prescribed the drug Centrax. A copy of the prescription was entered in the record during the hearing.

The hearing record also contained testimony about the stressful nature of Mr. Lewis's job and its relationship to his nervous disorder. For reasons that were not explained by SOCCO, Mr. Lewis had more people to supervise on his shift than any of the other shift foremen. Mr. Lewis supervised the preparation plant and refuse dump area on the afternoon shift. He supervised fourteen workers dispersed over a large area. On the midnight shift, with fourteen workers, there were two supervisors. On the day shift, with twenty-five to thirty-five workers, there were approximately seven supervisors. On numerous occasions, Mr. Lewis sought additional supervisory help from his employer. Both Mr. Zanussi and Mr. Haught testified that Mr. Lewis had complained about the working conditions, asking for additional supervisory personnel on his shift. The last complaint to Mr. Haught was about one month before Mr. Lewis quit.[3] After this complaint, Mr. Haught testified that he added two employees to the afternoon shift for Mr. Lewis to supervise.[4]

Robert Stansberry, a utility man supervised by Mr. Lewis, testified that the workers on the afternoon shift had been discussing Mr. Lewis's need for additional help since approximately 1983. During the year prior to Mr. Lewis's resignation, he noticed changes in Mr. Lewis's behavior and related an incident which occurred in March, 1986, when Mr. Lewis "just sat down on the bench and cried and that was how

---

"A: Yes.
"Q: Explain that please.
"A: He said that the job was making him nervous—was one of the reasons." (TR 35–36).

2. Administrative hearing, September 16, 1986 at 177.

3. Mr. Haught testified during the administrative hearing held on September 9, 1986, as follows:
"Q: Okay. And when he said that he needed help, did he tell you why he needed help?
"A: He just told us—you know, the job was making him nervous and his people was unruly [sic]. He had a lot to do.

"Q: And when was this conversation approximately?
"A: I'd say maybe a month before he give [sic] his resignation or maybe a month and a half. I don't remember." (TR 66).

4. Although not made a formal finding by the ALJ, there was evidence that Mr. Lewis was the only black shift supervisor. He testified that he had been the butt of racial slurs which had diminished in recent years. However, he was never invited to the shift supervisors' Christmas party although he had asked to be.

shook up he was." He had never seen that behavior before. Four other employees who were supervised by Mr. Lewis similarly testified about the work stress and Mr. Lewis's nervous behavior changes.

SOCCO argued that in addition to the lack of medical documentation to support the claimed health problem, Mr. Lewis voluntarily left his employment in order to take a new job. SOCCO relied on testimony by Mr. Zanussi and Mr. Haught. Mr. Zanussi's testimony was contradictory. Initially, he summarized Mr. Lewis's reasons for resigning to include that "he stated he had a job lined up in Atlanta doing construction,"[5] but upon further questioning by SOCCO's counsel, he stated "he said—he was hoping to get another job in Atlanta in construction."[6] Mr. Haught testified that Mr. Lewis "was going to Atlanta" and that "[h]e didn't have a job."[7]

■ We, along with other courts,[8] have taken the traditional view as expressed in Syllabus Point 6 of *Davis v. Hix*, 140 W.Va. 398, 84 S.E.2d 404 (1954):

"Unemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent thereof."

*See also Courtney v. Rutledge*, 177 W.Va. 232, 351 S.E.2d 419 (1986); *Perfin v. Cole*, 174 W.Va. 417, 327 S.E.2d 396 (1985); *Kirk v. Cole*, 169 W.Va. 520, 288 S.E.2d 547 (1982).

■ In several cases, we have recognized that an individual was not disqualified from unemployment compensation benefits where he left work for health reasons. Chief Justice Brotherton spoke to this point in *McDonald v. Rutledge*, 174 W.Va. 649, 328 S.E.2d 524 (1985). There, a worker received recurring blisters to his hands from the repetitive tightening of strings in a shoe mold, and we stated in the single Syllabus:

"For purposes of determining eligibility for unemployment compensation benefits, a recurring injury of a severity that physically prevents the worker from completing his assigned tasks is a compelling reason to leave work."

■ Earlier in *Gibson v. Rutledge*, 171 W.Va. 164, 168, 298 S.E.2d 137, 141 (1982), we indicated that where "an employee ... has been compelled to terminate his employment for reasons of health, [he] cannot be said to have voluntarily quit his job." *Gibson* was grounded on *Kirk v. Cole*, *supra*, where Justice Neely concluded in the single Syllabus:

"Absence from work due to illness does not constitute misconduct within the meaning of *W.Va.Code*, 21A–6–3(2) [1981] and a claimant for unemployment compensation will not be disqualified from receiving benefits for the six-week statutory period because he or she was discharged for excessive absenteeism due to illness."

■ The common thread that runs through these cases is that if an employee's health condition is caused by or connected to employment and has reached the degree of severity that a reasonably prudent person would be justified in giving up

---

5. Administrative hearing, September 6, 1986 at 11.

6. Administrative hearing, September 6, 1986 at 36.

7. Administrative hearing, September 6, 1986, at 78–79.

8. *See Sanchez v. California Unemployment Ins. Appeals Bd. (Tribal American Consulting Corp)*, 36 Cal.3d 575, 205 Cal.Rptr. 501, 685 P.2d 61 (1984); *F.A.A. v. Administrator, Unemployment Compensation Act*, 196 Conn. 545, 494 A.2d 564 (1985); *Snead v. Unemployment Ins. Appeal Bd.*, 486 A.2d 676 (Del.1984); *Camara v. Agsalud*, 67 Hawaii 212, 685 P.2d 794 (1984); *Brumley v.*

*Iowa Dep't of Job Serv.*, 292 N.W.2d 126 (Iowa 1980); *Davis v. Board of Review of Dep't of Labor*, 125 Ill.App.3d 67, 80 Ill.Dec. 464, 465 N.E.2d 576 (1984); *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training*, 309 Md. 28, 522 A.2d 382 (1987); *Wilkerson v. Jackson Pub. Schools*, 170 Mich.App. 133, 427 N.W.2d 570 (1988); *Geo. A. Hormel & Co. v. Asper*, 428 N.W.2d 47 (Minn.1988); *Steffy v. Commissioner, Unemployment Compensation Bd. of Review*, 499 Pa. 367, 453 A.2d 591 (1982); *Gratzfeld v. Bomgaars Supply*, 391 N.W.2d 200 (S.D.1986); *Shufelt v. Department of Employment & Training*, 148 Vt. 163, 531 A.2d 894 (1987).

employment, then the employee has not made a voluntary quit. This is the general rule elsewhere and applies to both physical and mental disabilities. With regard to physical disabilities, *see, e.g., Graham v. Daniels,* 269 Ark. 774, 601 S.W.2d 229 (App.1980); *Electronic Fab Technology Corp. v. Wood,* 749 P.2d 470 (Colo.App. 1987); *Fannon v. Federal Cartridge Corp.,* 219 Minn. 306, 18 N.W.2d 249, 158 A.L.R. 389 (1945); *Brown v. Board of Review,* 117 N.J.Super. 399, 285 A.2d 38 (1971); *Lord v. Job Serv. of North Dakota,* 343 N.W.2d 92 (N.D.1984); *Kulik v. Board of Review,* 14 Ohio App.3d 302, 14 Ohio B. 359, 471 N.E.2d 188 (1984); Annot., 14 A.L.R.2d 1308 (1950 & Supp.1987)); Annot., 12 A.L.R.4th 629 (1982). With regard to mental disabilities, *see, e.g., Vulcan Materials Co. v. Holst,* 418 So.2d 152 (Ala.App. 1982); *Davis v. Board of Review,* 125 Ill. App.3d 67, 80 Ill.Dec. 464, 465 N.E.2d 576 (1984);[9] *City of Florissant v. Labor & Indus. Relations Comm'n,* 613 S.W.2d 713 (Mo.App.1981); *Inside Radio/Radio Only, Inc. v. Board of Review,* 204 N.J.Super. 296, 498 A.2d 791 (1985); *Deiss v. Unemployment Compensation Bd. of Review,* 475 Pa. 547, 381 A.2d 132 (1977); *Meiling v. Employment Div.,* 74 Or.App. 292, 702 P.2d 1151 (1985); Annot., 1 A.L.R.4th 802 (1980).

■ The employer argues, however, that there was insufficient medical evidence to establish Mr. Lewis's medical condition. It appears that in the absence of some specific provision in an unemployment compensation statute, most courts do not require that there be medical testimony to support a claimant's health problems as long as there is credible testimony as to their severity. *See Vulcan Material Co. v. Holst, supra; State Dep't of Indus. Rel. v. Clark,* 369 So.2d 561 (Ala.Civ.App.), *writ denied,* 369 So.2d 562 (1979); *Woods v. Daniels,* 269 Ark. 613, 599 S.W.2d 435 (1980); *Rabago v. Unemployment Ins. Appeals Bd.,* 84 Cal.App.3d 200, 148 Cal.Rptr. 499 (1978); *Andersen v. Industrial Comm'n,* 167 Colo. 281, 447 P.2d 221 (1968); *City of Indianapolis v. Review Bd. of Indiana Employment Security Div.,* 441 N.E.2d 36 (Ind. App.1982); *Jantzen of Louisiana, Inc. v. Blache,* 486 So.2d 1176 (La.App. 3d Cir.), *cert. denied,* 490 So.2d 279 (1986); *Milliken & Co. v. Griffin,* 65 N.C.App. 492, 309 S.E.2d 733 (1983), *rev. denied,* 311 N.C. 402, 319 S.E.2d 272 (1986); *Charbonneau v. Employment Div.,* 75 Or.App. 78, 705 P.2d 230 (1985); *Goettler Dist., Inc. v. Commonwealth Unemployment Comp. Bd.,* 96 Pa.Commw. 632, 508 A.2d 630 (1986); *Box Elder County v. Industrial Comm'n of Utah,* 632 P.2d 839 (Utah 1981).

We recognize that after this case arose, the legislature amended W.Va.Code, 21A–6–3, to require that a person who leaves for health reasons must present "certification from a licensed physician that his work aggravated, worsened, or will worsen the individual's health problem."[10] This provision is a new requirement and, as we explained in *West Virginia Bd. of Dental Examiners v. Starch,* 146 W.Va. 662, 670, 122 S.E.2d 295, 300 (1961), such a change demonstrates a legislative "intention to supply some provision not embraced in the former statute." Thus, in view of the statutory amendment, the result in this case is limited.

**9.** *Davis* appears to resolve the issue under a "work pressure" theory where the employee is unilaterally given additional duties, without any change in compensation. In this situation, medical testimony is not critical because the crux of the case is forcing the employee to do substantially increased work. *See Hunt v. Rutledge,* 177 W.Va. 523, 354 S.E.2d 619 (1987); *Murray v. Rutledge,* 174 W.Va. 423, 327 S.E.2d 403 (1985).

**10.** The full text of the relevant amendment of W.Va.Code, 21A–6–3(1), is:

"Further, for the purpose of this subdivision, an individual shall not be deemed to have left his most recent work voluntarily without good cause involving fault on the part of the employer, if such individual was compelled to leave his work for his own health-related reasons and presents certification from a licensed physician that his work aggravated, worsened, or will worsen the individual's health problem."

It is apparent that this amendment does not require the presentation of the certification to the employer prior to the employee's leaving.

In conclusion, we believe the circuit court was correct. The evidence does demonstrate substantial credible evidence as to Mr. Lewis's health condition. In addition to his testimony, SOCCO's personnel manager, Mr. Zanussi, was aware of the condition prior to Mr. Lewis's resignation, as was his immediate supervisor, Mr. Haught. His previous complaints about the stressful nature of the work because of a lack of supervisory help was known to them. Other employees testified about Mr. Lewis's emotional instability from work stress. We, therefore, affirm the judgment of the Circuit Court of Kanawha County.

Affirmed.