464 S.E.2d 785

**Ronald DAVIS, et al., Petitioners,**

v.

**Cathy S. GATSON, Clerk of the Circuit Court of Kanawha County; the Board of Review of the West Virginia Department of Employment Security; and Corhart Refractories Corporation, Respondents.**

No. 22859.

Supreme Court of Appeals
of West Virginia.

Submitted Sept. 26, 1995.

Decided Nov. 17, 1995.

J. Robert Weaver, Thomas P. Maroney, Charleston, for Petitioners.

John R. Merinar, Jr., Steptoe & Johnson, Clarksburg, for Corhart Refractories Corp.

McHUGH, Chief Justice:

This is a petition for a writ of certiorari,[1] in which twenty-two employees seek unemploy-

---

1. *W.Va.Code,* 21A–7–27 [1970] states: "The appeal from the decision of the circuit [court] of Kanawha county may be taken to the supreme court of appeals if a proper petition for certiorari is filed within sixty days of the date of the final decision of the circuit court of Kanawha county.

ment compensation benefits for a two-week period in August of 1992 during which their employer shut down its facility. Though the Board of Review of the West Virginia Bureau of Employment Programs had determined that, under *W.Va.Code,* 21A–1–3 [1991], the employees were entitled to such benefits because the employer failed to give unequivocal notice of the planned shutdown within ninety days thereof, the Circuit Court of Kanawha County reversed, ruling that *W.Va.Code,* 21A–1–3 [1991] does not require such notice to be unequivocal and that the employees were sufficiently informed of the planned shutdown. This Court has before it the petition, all matters of record and the briefs and arguments of counsel. For the reasons stated below, the order of the circuit court is reversed.

### I.

The following relevant events, which, for the most part, are undisputed, occurred prior to the planned two-week shutdown of the Buckhannon, West Virginia facility of respondent Corhart Refractories Corp. (hereinafter "Corhart"). On March 5, 1992, a labor-management meeting was held where, as the minutes of the meeting reflect, plant manager Jim Zalaznik commented upon the possibility of a planned plant shutdown: "We are starting to plan a shutdown for this summer because of the sales forecast. I want to discuss it early so people can be planning ahead. The exact timing isn't set yet, but it is definitely after school is out." Two months later, on May 7, 1992, another labor-management meeting took place and, according to the minutes of that meeting, the fol-

The cases shall go from the circuit court of Kanawha county only on writ of certiorari and need be heard only at the session of the supreme court."

2. Corhart was authorized to plan a shutdown of its facility under the collective bargaining agreement in effect at the time between Corhart and the Aluminum Brick and Glass Workers International Union, AFL–CIO Local No. 477, the union which represents the employees. The collective bargaining agreement provided, in pertinent part:

**ARTICLE 15**
**VACATION PAY**

. . . .

lowing relevant comments were made by Mr. Zalaznik:

The order backlog is very low. There are only a couple of weeks of forming an Isopress and Special Materials. Corning France is the only order even available now. The Russian order is still being discussed but there are no promises. If something isn't received soon, we face some kind of layoff. A shutdown is being planned in August.[2]

(footnote added).

The following week, Corhart posted its first announcement of a planned shutdown[3]. The notice read, in relevant part:

### NOTICE

#### Summer Shutdown Announcement

Please plan on a two week total plant production shutdown August 10–August 23. Plan to take vacation during that time unless your supervisor and the Plant Manager approve an exception. Some administrative areas may need to work. Also, a skeleton security staff will be maintained in the plant.

If orders are received, you will be immediately notified of cancellation of the shutdown.

When it was subsequently determined that the shutdown should occur one week later than was originally stated in the first shutdown announcement, the following revised announcement was posted on May 15, 1992, approximately ninety days prior to the planned shutdown:

**SECTION 5.** Employees are required to take their vacation except for their optional week. The company reserves the right to shut down any or all of its departments or plants for part or all of the vacation periods and to have the employees take their vacations at such time.

The collective bargaining agreement further provides, in article 15, sections 2 and 3, that employees who have accrued vacation pay are entitled to receive it on July 1 of any given year.

3. According to Corhart, the 1992 shutdown was only the second shutdown in the plant's history. The other shutdown, which occurred in 1991, was planned due to poor business conditions.

NOTICE

Revised
Summer Shutdown
Announcement

Due to the ship date of the Corning France order, the shutdown has been delayed one week. Please plan on a two week total plant production shutdown August 17—August 30. Plan to take vacation during that time unless your supervisor and the Plant Manager approve an exception. Some administrative areas may need to work. Also, a skeleton security staff will be maintained in the plant.

If orders are received, you will be immediately notified of cancellation of the shutdown.

According to the minutes of the labor-management meeting held on July 1, 1992, the status of the planned shutdown was again discussed:

The quote activity has been heavy, so we have some chances for orders. We did receive a Central Glass Fiber order and hope to receive an Iwaki and Oschatz, Poland order. We also look for an OCF order for late in the year. However, all of these orders only add up to the disappointing $17 million forecast for 1992. Any fall out from these would be a drop from this number. It is difficult to forecast any substantial changes in manpower until I get more information on these orders. *It's possible that the shutdown could be cancelled if these orders are received, but I can't plan without the details.*[4]

(emphasis and footnote added.)

Finally, on July 27, 1992, Corhart posted the following notice of shutdown and, in addition, the following shutdown policy:

NOTICE

The scheduled shutdown is firm now that the orders we were waiting for have arrived and been evaluated. They do not require enough production to prevent the shutdown.

Additional details about shutdown procedures will be available soon. If you have any immediate questions about the shutdown, please see your supervisor.

### SHUTDOWN POLICY

During the planned two week shutdown, starting August 17, 1992, all hourly employees will be required to take vacation.

If an employee does not have enough vacation time to cover the shutdown, they will be required to take whatever vacation time they have and be placed on layoff for the remainder of the two week period.

Employees who wish to take time off later in the year and have exhausted their vacation, may, if their Supervisor agrees, take a leave of absence without pay.

A few employees may be required to work as needed.

If you have any questions concerning this policy or unemployment benefits, please see Mike Pasternak.

According to Corhart, because it had received a decreased number of orders, it had urged its employees to take vacation earlier that summer in an effort to avoid a shutdown.[5] The petitioners herein are twenty-two hourly employees who chose not to take vacation until the shutdown period in August. Consequently, they had sufficient vacation accrued to cover the entire two-week shutdown period.[6] The petitioners (hereinafter

---

4. Corhart maintains that a discussion of the planned shutdown at the July 1, 1992 meeting was inevitable considering that all employees, including the claimants, were to receive and, in fact, did receive, their vacation pay on that day, pursuant to article 15, sections 2 and 3 of the collective bargaining agreement, discussed *supra*. According to Corhart, though employees receive vacation pay on July 1 of any given year, such pay, for administrative purposes, is allocated to the weeks during which employees actually take vacation.

5. The record reveals that by memorandum dated January 7, 1992, Corhart notified its employees that vacation requests received between January 1 and March 31, 1992 would be granted on a seniority basis, while those requests received between April 1 and July 1, 1992 would be granted on a first-come, first-served basis.

6. Conversely, employees who did take vacation earlier in the year had exhausted their vacation and were, thus, placed on layoff during the two-week shutdown. As a result, these employees

"claimants") subsequently applied for unemployment compensation benefits for the two-week shutdown period with the West Virginia Department of Employment Security (hereinafter "DES").

DES Deputy Pat Pingley found that claimants were eligible for unemployment compensation benefits because they were partially unemployed during the two-week shutdown period. *See W.Va.Code,* 21A-6-1(4) [1987] ("[a]n unemployed individual shall be eligible to receive benefits only if the commissioner finds [*inter alia,*] that ... (4) He has been totally or partially unemployed during his benefit year for a waiting period of one week prior to the week for which he claims benefits for total or partial unemployment"); *W.Va.Code,* 21A-1-3 [1991] (" '[P]artial unemployment' means: ... [a]n individual who has not been separated from employment is partially unemployed in any week in which due to lack of full-time work wages payable to him are less than his weekly benefit amount plus twenty-five dollars: Provided, That said individual must have earnings of at least twenty-six dollars.") [7] However, Deputy Pingley found claimants to be disqualified [8] for benefits under *W.Va.Code,* 21A-1-3 [1991], which states in relevant part:

the term 'wages' does not include: ... (10) Vacation pay ... received by an individual

before or after becoming totally or partially unemployed but earned prior to becoming totally or partially unemployed: Provided, That the term totally or partially unemployed shall not be interpreted to include ... (B) *employees who are on vacation by reason of the employer's request provided they are so informed at least ninety days prior to such vacation*[.]

Deputy Pingley concluded that the May 15, 1992 notice of shutdown posted by Corhart sufficiently informed the claimants of the shutdown within ninety days thereof and that, consequently, they were disqualified from benefits for the two-week shutdown period because their wages exceeded their weekly benefit amount by twenty-five dollars or more.[9] *See W.Va.Code,* 21A-1-3 [1991] (defining partial unemployment).

The claimants appealed Deputy Pingley's decision to the Board of Review of the West Virginia Bureau of Employment Programs and a hearing was conducted on November 2, 1992 before Administrative Law Judge Roderick A. Devison. Claimant Kenneth Johnston testified that, in late June of 1992, during a meeting with Mr. Zalaznik, the plant manager, Mr. Zalaznik indicated that he would let the employees know in a few weeks whether the shutdown was going to occur.[10]

---

were qualified to collect unemployment compensation benefits for the shutdown period.

7. *W.Va.Code,* 21A-6-1 was amended in 1994. However, the changes made thereto do not affect the issues in this appeal. *W.Va.Code,* 21A-1-3 was amended in 1993 and 1994. In 1994, the legislature changed, *inter alia,* the meaning of the term partial unemployment insofar as "[a]n individual who has not been separated from employment is partially unemployed in any week in which due to lack of full-time work wages payable to him are less than his weekly benefit amount *plus sixty dollars:* Provided, That said individual must have earnings *of at least sixty-one dollars."* (emphasis added).

8. "The West Virginia Unemployment Compensation Law provides a two-step process to determine entitlement to unemployment compensation benefits. When an individual is held to be eligible to receive such benefits, the next step is to consider possible disqualification from receiving such benefits. *Kisamore v. Rutledge,* 166 W.Va. 675, 680, 276 S.E.2d 821, 824 (1981)." *Peery v. Rutledge,* 177 W.Va. 548, 550 n. 2, 355 S.E.2d 41, 43 n. 2 (1987).

9. Deputy Pingley rendered separate, but virtually identical, decisions for each of the twenty-two claimants. In that the claimants received varying rates of pay from Corhart, the amount of vacation pay and the amount of overpayment of benefits received by each claimant differed.

10. At the November 2, 1992 hearing, the following relevant testimony was elicited:

Q [Judge to Mr. Johnston:] Did you have some testimony you'd like to offer regarding a policy meeting on or about—or some time in—
A [Mr. Johnston:] It was some time in the last of June.
Q [Judge:] Okay.
A [Mr. Johnston:] At that time, Jim was asked and he said—
Q [Judge:] Mr. Zalaznik?
A [Mr. Johnston:] Yes, sir.
Q [Judge:] All right.
A [Mr. Johnston:] *At that time we had about three weeks, something like that to go, and he said we will let you know in two weeks. As of whether we're going to have the shut down or not.*
....

In addition, Sturl Waybright, president of the local union and also a claimant herein, testified that many employees were confused as to whether a shutdown was actually going to occur because there had been rumors that Corhart had been receiving orders and that there was a possibility the shutdown might be cancelled. Mr. Waybright further testified that he approached Corhart's personnel manager, Mike Pasternak, on more than one occasion regarding the status of the shutdown and that Mr. Pasternak's response was that "we really don't know yet." Conversely, notwithstanding Corhart management's hope that it would receive enough orders to warrant a cancellation of the shutdown, Mr. Zalaznik, the plant manager, testified that the shutdown was going to occur as scheduled, unless cancelled, and that no such cancellation occurred.[11]

In a decision dated November 10, 1992, ALJ Devison found, *inter alia:*

There were several policy statements and explanations regarding the vacation time announced by the employer. There were some rumors that the shutdown would not occur if the employer got sufficient orders which had to be met at or during the period of the shutdown. Additional statements were made by the employer and passed on to the claimants and the other hourly workers that there could be some changes made but that the shutdown was still affirmed.

ALJ Devison concluded that *W.Va.Code,* 21A–1–3 [1991]

provides that the phrase totally or partially unemployed shall not be interpreted to mean employees who are on vacation by reason of the request of the employer where the employees have been informed about the vacation at least 90 days prior to the vacation. *The record reflects that the claimants were informed of the vacation on May 15, 1992, more than 90 days prior to the commencement of the vacation. Accordingly, having met the statutory notice requirement, it must be concluded that the claimants are neither totally nor partially unemployed. Article 21A–6–1 provides that an individual is not eligible for benefits unless he/she is totally or partially unemployed. Since the claimants are neither totally nor partially unemployed they are not eligible for benefits. The claimants are not disqualified.* In view of the decision on eligibility, there remains an

---

MR. ZALAZNIK: I don't recall the date, but I remember in one of the policy meetings I explained the reason for the 90–day warning or notice and the purpose the fact that the company wanted to pay vacations which, you know, it's obligated to do and wants to, but didn't see paying unemployment if the people had the opportunity to take paid vacation. And I think all along I expressed the fact that, yeah, if we get enough orders and if something like a miracle happens, we could cancel it, but I don't remember.

It's an interpretation of whether somebody says, well, I'm going to firm it up or it still could be cancelled. That doesn't sound very firm. But I think we also said if somebody had a vacation scheduled and that we cancelled the shut down, then we would go ahead and offer that vacation period.

(emphasis added).

11. Mr. Zalaznik testified, in relevant part:

You know, all along everybody was hoping, of course, for more orders. So as Mr. Pasternak has stated, we don't normally take a shut down, we're not the kind of business that normally does, except in this case, the last two years when our business is down almost 50 percent, and we, in fact, have about 50 people on layoff.

So throughout all this, and you see the notes from the meeting where even in March I said we were planning a shut down, but we had yet to make the announcement. Whenever anybody asked, they said, you know, when somebody says they don't know, it's they don't know that it's going to be canceled. In other words, all along we said, yeah, we would love to cancel it, and we would love to have some orders, but that we continue, you know, if we're going to have people take vacations and pay them for their vacations, that we want to abide by this 90–day notice, so it was definitely going to be a shut down unless we canceled. So, on July 27th, there were a lot of rumors flying around because everybody knows when we get a few orders. So there were a lot of rumors flying around, well, maybe it will be canceled.

. . . .

Just to reiterate the fact that there was never a notice posted after the May 15th notice that said anything different that there wouldn't be a shut down.

overpayment which may be collected in accordance with the usual procedures.[12] (footnote and emphasis added).

The claimants appealed the administrative law judge's decision to the Board of Review of the West Virginia Bureau of Employment Programs (hereinafter "Board of Review").[13] In a decision dated February 8, 1993, the Board of Review determined, *inter alia*, that the May 15, 1992 shutdown notice, posted more than ninety days before the planned shutdown, was "equivocal in nature" and as such, did not satisfy the requirements of *W.Va.Code*, 21A–1–3 [1991]. The Board of Review ruled that claimants were partially unemployed and therefore eligible for benefits. The Board further found that the claimants were not disqualified, stating, in pertinent part:

Although employees were advised to plan on a plant shutdown for [August 17 to August 30, 1992], the notice indicated that an employee's supervisor or the plant manager could approve an exception. Moreover, the notice indicated that certain other areas might need to work. Finally, the notice indicated that the vacation shutdown would be cancelled if orders were received. The record reflects that orders were thereafter received and there was great confusion among employees as to whether or not the shutdown would take effect. It was not until approximately thirty days prior to the shutdown that employees were notified that the shutdown was firm. That notice on its face said that not enough orders had been received to prevent the shutdown. Finally the shutdown policy, issued approximately twenty days prior to the shutdown, stated that certain exceptions would be made. *Under all the circumstances of this case it is apparent that the notice issued on May 15, more than ninety days prior to the shutdown, was equivocal in nature. The obvious purpose of the statutory ninety day requirement is to provide notice to employees so that vacation plans may be made. The record in this case*

*plainly reflects that the equivocal notice, the subsequent receipt of orders and the obvious confusion among employees did not serve to satisfy the statutory ninety day requirement. If the notice had been unequivocal the Board would not hesitate to make a different finding. However, the notice was on its face, not unequivocal and the circumstances that followed after the posting of the notice indicate that the statutory objective has not been satisfied. Accordingly, it is concluded that the claimants were partially unemployed within the meaning of the unemployment statute.*

(emphasis added).

Corhart subsequently appealed the Board of Review's decision to the Circuit Court of Kanawha County. *See W.Va.Code*, 21A–7–17 [1967]. In a final order dated September 22, 1994, the circuit court reversed the Board of Review's decision:

The Board's determination that the notice of the plant closing was equivocal is a finding of fact and as such is entitled to 'plainly wrong' deference. The Court adopts the Board's findings of fact herein by reference in their entirety.

However, the Board's assumption that the statute requires an absolutely unequivocal notice is a conclusion of law that may be reviewed by this Court. *Kisamore v. Rutledge*, 276 S.E.2d 821 (W.Va.1981).

After a thorough review of the record, this Court concludes that there is no evidence or authority that notice must be unequivocal. Thus, the Board was incorrect in determining that the requirements of § 21A–1–3 regarding the definition of 'wages' were not satisfied as a matter of law.

Accordingly, the Court does hereby ORDER that the final decision by the Board of Review is reversed and the vacation pay received by the claimants shall be used in

---

**12.** ALJ Devison agreed with Deputy Pingley's ruling that the claimants were not entitled to unemployment compensation benefits. ALJ Devison modified Deputy Pingley's decision insofar as Devison found the claimants to be *ineligible* for such benefits and not disqualified.

**13.** *See Adkins v. Gatson*, 192 W.Va. 561, 565, 453 S.E.2d 395, 399 (1994) ("Under the statutory scheme of *W.Va.Code*, 21A–7–1 *et seq.*, the findings of the ALJ are recommendations only and are not binding on the Board of Review.")

determining their eligibility for unemployment benefits.

This order is before this Court, pursuant to *W.Va.Code*, 21A–7–27 [1970].

## II.

An unemployed individual is eligible to receive unemployment compensation benefits if the Commissioner finds, *inter alia*, that such individual "has been totally or partially unemployed during his benefit year for a waiting period of one week prior to the week for which he claims benefits for total or partial unemployment[.]" *W.Va.Code*, 21A–6–1(4) [1987]. At the time of the August 1992 shutdown, *W.Va.Code*, 21A–1–3 [1991] defined total and partial unemployment as follows:

(1) An individual is totally unemployed in any week in which such individual is separated from employment for an employing unit and during which he performs no services and with respect to which no wages are payable to him.

(2) An individual who has not been separated from employment is partially unemployed in any week in which due to lack of full-time work wages payable to him are less than his weekly benefit amount plus twenty-five dollars: Provided, That said individual must have earnings of at least twenty-six dollars.

*W.Va.Code*, 21A–1–3 [1991] further provided, in relevant part, that

the term 'wages' does not include: ... (10) Vacation pay ... received by an individual before or after becoming totally or partially unemployed but earned prior to becoming totally or partially unemployed: Provided, That the term totally or partially unemployed shall not be interpreted to include ... (B) employees who are on vacation by reason of the employer's request provided they are so informed at least ninety days prior to such vacation[.] [14]

(footnote added).

In determining whether the claimants herein are eligible to receive unemployment compensation benefits under *W.Va.Code*,

21A–6–1(4) [1987] and 21A–1–3 [1991], we must address two issues: (1) whether, as a matter of law, *W.Va.Code*, 21A–1–3 [1991] requires an employer to "unequivocally" inform employees of employer-requested vacation at least ninety days prior thereto; and (2) if unequivocal notice is required under *W.Va.Code*, 21A–1–3 [1991], whether this requirement was satisfied by the May 15, 1992 shutdown announcement, posted at least ninety days prior to the planned shutdown.

### A.

It is well-settled in this jurisdiction that the Board of Review's findings of fact will only be set aside if they are clearly wrong. However, the Board's conclusions of law are fully reviewable by this Court:

The findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*.

Syl. pt. 3, *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994). *See* syllabus, *Courtney v. Rutledge*, 177 W.Va. 232, 351 S.E.2d 419 (1986); syl. pt. 2, *Perfin v. Cole*, 174 W.Va. 417, 327 S.E.2d 396 (1985); syl. pt. 1, *Kisamore v. Rutledge*, 166 W.Va. 675, 276 S.E.2d 821 (1981). *See also W.Va.Code*, 21A–7–21 [1943] ("In a judicial proceeding to review a decision of the board, the findings of fact of the board shall have like weight to that accorded to the findings of fact of a trial chancellor or judge in equity procedure.") Whether *W.Va.Code*, 21A–1–3 [1991] required Corhart to unequivocally inform its employees, including the claimants, of the planned plant shutdown at least ninety days in advance, is a question of statutory interpretation. Thus, our review of *W.Va.Code*, 21A–1–3 [1991] is plenary. *Donley v. Bracken*, 192 W.Va. 383, 387, 452 S.E.2d 699, 703 (1994).

---

**14.** As we previously indicated, *W.Va.Code*, 21A–1–3 has been amended since the shutdown period in August 1992. *See* n. 7, *supra*. However, this particular provision of *W.Va.Code*, 21A–1–3 has not been changed.

■ The purpose of our State's unemployment compensation laws, as stated in *W.Va. Code,* 21A-1-1 [1978] "is to provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment[,]" so as to:

(1) Provide a measure of security to the families of unemployed persons.

(2) Guard against the menace to health, morals and welfare arising from unemployment.

(3) Maintain as great purchasing power as possible, with a view to sustaining the economic system during periods of economic depression.

(4) Stimulate stability of employment as a requisite of social and economic security.

(5) Allay and prevent the debilitating consequences of poor relief assistance.

*See Gibson v. Rutledge,* 171 W.Va. 164, 167–68, 298 S.E.2d 137, 141 (1982); *Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 166, 291 S.E.2d 477, 481 (1982). *See also Hill v. Board of Review,* 166 W.Va. 648, 651, 276 S.E.2d 805, 807 (1981). To that end, this Court has traditionally held that "[u]nemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent thereof." Syl. pt. 6, *Davis v. Hix,* 140 W.Va. 398, 84 S.E.2d 404 (1954). *See* syl. pt. 1, *Lewis v. Gatson,* 181 W.Va.

214, 382 S.E.2d 51 (1989); syl. pt. 1, *Perfin v. Cole, supra;* syl. pt. 1, *Gibson v. Rutledge, supra;* syl. pt. 1, *Lee–Norse Co. v. Rutledge, supra.* *See also Adkins v. Gatson,* 192 W.Va. at 564–65, 453 S.E.2d at 398–99; *Bailey v. Rutledge,* 174 W.Va. 476, 478, 327 S.E.2d 456, 458 (1985); *London v. Bd. of Review of Dept. of Employment Security,* 161 W.Va. 575, 576–77, 244 S.E.2d 331, 333 (1978). *Accord Kirk v. Cole,* 169 W.Va. 520, 523, 288 S.E.2d 547, 549 (1982).

■ The requirement of notice [15] in *W.Va. Code,* 21A–1–3 [1991] is a practical one, clearly meant to insure that employees are afforded ample opportunity to plan vacations for shutdown periods chosen not by them, but by their employer. We recognize that when planning a shutdown, employers are, at the same time, hopeful that business conditions will improve and that a shutdown will not be necessary. The record in this case does not suggest nor do the claimants contend that Corhart management answered employees' questions regarding the status of the shutdown in a manner intended to mislead or confuse them. Nevertheless, an employer which communicates its ambivalence to employees cannot fairly and reasonably expect them to confidently plan their lives, including vacation periods which may include many family members, only to have their plans disrupted when their employer determines that a shutdown is not warranted after all.[16] Unless a definite standard is set, the reason for the statutory requirement of informing

---

**15.** Corhart takes issue with the fact that *W.Va. Code,* 21A–1–3 [1991] employs the term "inform" and not "notice." However, Corhart neither distinguishes these terms nor contends that the use of one term as opposed to the other affects the issues in this case. To the contrary, the term "notice" is defined, *inter alia,* as "[i]nformation[.]" *Black's Law Dictionary* 1061 (6th ed. 1990).

**16.** We are enlightened by the federal Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. § 2101, *et seq.,* which requires some employers which are closing an operation or which are implementing a mass layoff to provide sixty days notice to affected employees. The United States Secretary of Labor has promulgated 20 C.F.R. § 639.1, *et seq.,* Worker Adjustment and Retraining Notification, pursuant to 29 U.S.C. § 2107(a) (1988). Under these regulations, notice to affected employees is required to be specific, 20 CFR § 639.7(a)(1) (1994) and, more significantly:

Notice may be given conditional upon the occurrence or nonoccurrence of an event, such as the renewal of a major contract, only when the event is definite and the consequences of its occurrence or nonoccurrence will necessarily, in the normal course of business, lead to a covered plant closing or mass layoff less than 60 days after the event. For example, if the non-renewal of a major contract will lead to the closing of the plant that produces the articles supplied under the contract 30 days after the contract expires, the employer may give notice at least 60 days in advance of the projected closing date which states that if the contract is not renewed, the plant closing will occur on the projected date.

20 C.F.R. § 639.7(a)(3) (1994), in relevant part.

In contrast, the May 15, 1992 shutdown announcements simply indicated, without specificity, that if orders were received, employees would be notified of the cancellation of the shutdown.

the employee at least ninety days prior to the designated vacation period could be undermined.

We hold, therefore, that an unemployed individual shall be eligible to receive benefits only if the Commissioner finds, *inter alia,* that he has been totally or partially unemployed during his benefit year for a waiting period of one week prior to the week for which he claims benefits for total or partial unemployment, under *W.Va.Code,* 21A–6–1(4) [1994]. The terms total and partial unemployment are defined in *W.Va.Code,* 21A–1–3 [1994]. However, under the definition of wages found in *W.Va.Code,* 21A–1–3 [1994], the term wages shall not include vacation pay received by an individual before or after becoming totally or partially unemployed but earned prior to becoming totally or partially unemployed, provided that the term totally or partially unemployed shall not be interpreted to include employees who are on vacation by reason of the employer's request provided they are unequivocally so informed at least ninety days prior to such vacation.

### B.

We must now determine if the May 15, 1992 shutdown announcement, posted at least ninety days prior to the planned shutdown, satisfied the requirements of *W.Va. Code,* 21A–1–3 [1991]. We find that it did not and that the claimants were partially unemployed during the shutdown period.

As we previously stated, "[t]he findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong." Syl. pt. 3, in relevant part, *Adkins v. Gatson, supra.* Applying this standard of review to the facts of this case, we do not find the Board's findings to be clearly wrong, as they are supported by the evidence presented.

The Board of Review found that the May 15, 1992 announcement stated "that employees should plan on a two week total plant production shutdown from August 17 to August 30[;]" "that they should plan to take vacation during that time unless their supervisor and the plant manager approved an exception[;]" "that some administrative areas may need to work[;]" and finally, "that if orders are received, employees will be notified immediately of the cancellation of the shutdown." The Board further found that:

[a]pparently there was some concern among employees as to whether the shutdown would actually occur. Orders were being received and there was discussion that the shutdown might not occur. Employees were concerned about scheduling vacations in light of the receipt of the orders and discussions that the shutdown might not occur. Those discussions prompted the employer to post the [July 27, 1992] notice ... that the shutdown would be firm.

As its decision indicates, the Board of Review's finding that the May 15, 1992 shutdown announcement was "equivocal in nature" was based upon the four corners of the posted announcement and upon events and discussions which occurred in relation thereto. We find that the Board fairly assessed the evidence in this regard and hold that its finding that Corhart failed to unequivocally inform its employees of the plant shutdown was not clearly wrong. Accordingly, the claimants were partially unemployed during the shutdown period, are eligible for unemployment compensation benefits under *W.Va. Code,* 21A–6–1(4) [1987] and are not disqualified. *See W.Va.Code,* 21A–6–3 [1990]; n. 8, *supra.*

### III.

For reasons discussed herein, the September 22, 1994 order of the Circuit Court of Kanawha County, denying the claimants unemployment compensation benefits, is reversed. This case is remanded to circuit court with directions to remand to the Board of Review for it to enter an order in accordance with this opinion, as required by *W.Va. Code,* 21A–7–28 [1936].

Reversed and remanded with directions.

ALBRIGHT, J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.